INTERNATIONAL BUSINESS
MACHINES, CORP., Plaintiff,

v.

MEDLANTIC HEALTHCARE
GROUP, Defendant.

Civ. A. No. 87–2897.

United States District Court,
District of Columbia.

March 16, 1989.

Duane D. Morse, Judith S. Sapir, Wilmer, Cutler & Pickering, Washington, D.C., for plaintiff.

Thomas A. Schmutz, Jane A. Ryan, Charles C. Thebaud, Jr., Newman & Holtzinger, P.C., Washington, D.C., for defendant.

CHARLES R. RICHEY, District Judge.

The parties have filed cross motions for summary judgment in this contract action, which arises out of the sale of a large business computer. Because the Court finds an absence of genuine issues of material fact, and because the Court finds that the plaintiff is entitled to judgment as a matter of law, the Court grants the plaintiff's motion and denies that of the defendant.

## FACTS

The plaintiff, International Business Machines ("IBM") requires little introduction. IBM is a massive, multinational corporation which distributes, among other things, large business computers. The defendant, Medlantic Healthcare Group ("Medlantic") is the non-profit parent corporation of several health care organizations located in the metropolitan Washington, D.C. area.[1]

In early 1986, Medlantic decided to expand its facilities beyond those available at its then location on the campus of the Washington Hospital Center in downtown Washington. Specifically, by 1986 Medlantic had become concerned with the inadequacies of the data processing facility at the Washington Hospital Center, and sought a larger location which would allow for the use of more sophisticated equipment. To this end, in December of 1986 Medlantic approved the relocation of its data processing facilities to a location in Silver Spring, Maryland (the "Data Center").

### 1. The Computer Order

In November of 1986, anticipating the move to the Data Center, and the purchase of at least one mainframe computer in connection with the move, Medlantic placed an order with IBM for a 3090–180 central processing unit (a "CPU") and peripheral equipment.[2] Medlantic made the order pursuant to an "Agreement for Purchase of IBM Machines" that had been executed by Medlantic's subsidiary, Washington Hospital Center, in 1984 (the "1984 Agreement").[3] On the same day that Medlantic ordered the 3090–180 CPU, Washington Hospital Center entered into an amendment of the 1984 Agreement that provided for a 25% educational discount on the purchase of the 3090–180 CPU.

Approximately two months later, on January 26, 1987, IBM began to market the 3090–18E CPU, an enhanced version of the 3090–180 CPU that Medlantic had ordered. Shortly thereafter, Medlantic's order was

---

1. Medlantic's subsidiaries include the Washington Hospital Center, Washington Hospital Center Health Systems, and Medlantic Management Corporation.

2. The November 1986 order was placed by Washington Healthcare Corporation, Medlantic's predecessor in interest.

3. The significance of an "Agreement to Purchase," and its role in IBM's sales process, will be described in greater detail below.

upgraded to an order for the 3090–18E CPU at no additional cost.

During this period, from December of 1986 to approximately March of 1987, Medlantic also undertook discussions with computer distributors other than IBM. Medlantic was able to do so, notwithstanding its outstanding order with IBM, by virtue of IBM's sales method.

The purchase of a major IBM computer implicates two separate agreements. The first agreement memorializes the relationship between IBM and the purchaser through execution of an "Agreement for Purchase of IBM Machines" (an "Agreement for Purchase").[4] The Agreement for Purchase is a standard, master agreement which establishes the general terms and procedures by which IBM computers may be acquired. It relates to no specific product, but instead sets forth general terms applicable to a broad class of IBM products. It contains no price provisions, and does not set forth any discounts which might apply to a purchase. The Agreement for Purchase places a purchaser under no obligation to actually purchase an IBM product. However, an order placed pursuant to an Agreement for Purchase enjoys priority as against orders not placed under an Agreement for Purchase.[5]

Although an Agreement for Purchase contains no precise pricing information as to a specific purchase, it does contain a general "Price Protection Provision." As will be shown, under the circumstances of this case Medlantic attaches some significance to the Price Protection Provision. It provides as follows:

> The Purchase Price for each on-order Machine shall be IBM's generally available single unit purchase price and shall be subject to all price increases, except that increases effective during the three-month period immediately prior to the date of Machine shipment shall not apply if the Customer's order was received by IBM prior to the date of announcement of the price increase.

As the language makes clear, the Price Protection Provision is intended to serve as insurance for the purchaser against increases in a product's "generally available" price during the three months preceding delivery.

The second relevant document in IBM's sales procedure is the Supplement to Agreement for Purchase (a "Supplement"). A Supplement, which is delivered shortly after a product is delivered, specifies the precise product to be purchased, the price to be paid and any applicable discounts. The Supplement is a product-specific document which outlines the precise terms upon which IBM is willing to sell. According to IBM, the Supplement constitutes the actual offer to sell a computer. As outlined in the Agreement to Purchase, the Supplement can be accepted either by permitting installation of the product or by payment of the purchase price specified in the Supplement. If the product is accepted, or if payment for the product is made, IBM contends that the Supplement merges with the previously executed Agreement to Purchase to form a unitary contract.

The Agreement to Purchase contains an integration and merger clause, which provides as follows:

> THIS AGREEMENT AND ANY OTHER APPLICABLE IBM AGREEMENTS, AMENDMENTS, SUPPLEMENTS, EXHIBITS AND CERTIFICATIONS, INCLUDING THOSE EFFECTIVE IN THE FUTURE, REFERENCING THIS AGREEMENT OR EXPRESSLY MADE A PART HEREOF, WILL BE THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES, SUPERSEDING ALL PROPOSALS OR PRIOR AGREEMENTS, ORAL OR WRITTEN AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.

---

4. As noted above, IBM first executed such an agreement in 1984.

5. Even though an order may be placed without execution of an Agreement to Purchase, the Agreement must be executed before any sale is actually consummated.

The Supplement reciprocates, stating that:

THIS SUPPLEMENT, THE REFERENCED AGREEMENT [for Purchase], OTHER APPLICABLE IBM AGREEMENTS, AMENDMENTS, EXHIBITS, AND CERTIFICATIONS ARE THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES, SUPERSEDING ALL PROPOSALS OR PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.

Because during the period between November 1986 to March 1987, Medlantic had executed only the 1984 Agreement to Purchase, and had not paid for or accepted installation of an mainframe computer, Medlantic was not bound to actually purchase an IBM computer. Thus, by way of comparative shopping, and notwithstanding the fact that it had already executed the 1984 Agreement, Medlantic sought quotes from various other dealers on a mainframe computer during this period.

As noted above, Medlantic upgraded its order on January 26, 1987 to include the new 3090–18E CPU at no additional cost. However, on February 17, 1987, Medlantic received a letter indicating that the educational discount on the 3090–18E CPU would only be 15%, rather than the 25% that Medlantic had previously been quoted on the previously ordered 3090–180 CPU.[6]

### 2. The Mistaken Price Quote

Notwithstanding the letter referred to in the preceding paragraph, at a meeting between Medlantic and local IBM sales representatives held on April 2, 1987, IBM orally informed Medlantic that the educational discount available on the 3090–18E CPU would be 25%, rather than the 15% quoted to Medlantic on February 17. The effect of the increase in the educational discount was to reduce the quoted price of the 3090–18E CPU by $233,140. During this period, Medlantic had been receiving quotes from other distributors that were approximately $300,000 below IBM's quoted price with the 15% educational discount. There is evidence in the record which suggests that IBM representatives were aware of Medlantic's discussions with other dealers, as well as the prices Medlantic had been quoted by the other dealers.[7]

At the April 2 meeting, Michael Putro, Medlantic's Director of Computer Services, apparently informed the IBM representatives that they had a "deal" as a result of the increased educational discount, and asked the IBM representatives for written confirmation.[8] Mr. Putro testified that the following day, on April 3, he notified a representative of the leading competing dealer of his "final decision to go with IBM."[9] On April 21, 1987, Mr. Putro received a written statement of the price of the 3090–18E CPU. The statement included the 25% educational discount, but also included the following language: "All prices are for your information only, and are subject to change without notice." At his deposition, Mr. Putro testified that he received subsequent assurances from IBM representatives that the 25% discount was "firm, fixed, in the bag, iron clad."[10]

On May 6, 1987, Medlantic executed a second Agreement for Purchase (the "1987 Agreement"). The 1987 Agreement was intended to, and did, supersede the 1984

---

**6.** The earlier educational discount had been given only to Washington Hospital Center, Medlantic's teaching hospital subsidiary. However, on February 17, 1987, IBM extended the discount to Medlantic as well, in light of the fact that the 3090–18E CPU would be used almost exclusively in connection with Washington Hospital Center.

**7.** See Exhibit 12 to Defendant's Motion for Summary Judgment (internal IBM "bullets" describing actions IBM might take if Medlantic were to accept competing offer).

**8.** Putro Dep. at 177.

**9.** Id. at 178–79.

**10.** Putro Dep. at 189. One of the IBM sales representatives who had made the April 2 quote also testified that, in her personal opinion, "IBM was bound" by the April 2 quote and the April 21 letter. Coleman Dep. at 101.

Agreement. At the time the 1987 Agreement was signed, Medlantic appears to have been operating under the assumption —based upon the April 2 meeting and the April 21 letter—that a 25% educational discount would be available on the 3090–18E CPU.[11] At that point, on May 6, everything appeared to be rosey; Medlantic, at least, was prepared to proceed with the deal.

Things fell apart on May 19. On that date, IBM sales representatives met with Putro and informed him that the 25% educational discount quoted on April 2 had been a mistake. Instead of a 25% discount, the 3090–18E CPU would qualify only for a 15% discount.[12] IBM explained the erroneous April 2 quote as the product of internal crossed wires. Apparently, according to IBM, local representatives had misread certain internal correspondence relating to educational discounts, and, eager to cement the Medlantic transaction, had then conveyed the erroneous information to Medlantic. Putro's reaction to the news, not surprisingly, was bad. He told the IBM representatives that, in his view, IBM had committed itself to the 25% discount, and demanded an explanation of IBM's conduct from a senior IBM executive.

On May 21, Putro met with Alfred Bush, the IBM Branch Manager in charge of the Medlantic sale. Bush told Putro that IBM would not compromise on the educational discount available for the 3090–18E CPU— that under no circumstances would the discount be greater than 15%. Bush presented Putro with three alternative, including a cancellation of the sale, but refused to budge on the 15% discount. Putro rejected IBM's proposals, and, of the opinion that IBM was bound by its April 2 quote and April 21 letter, Putro ordered IBM to ship the 3090–18E CPU as ordered.

Medlantic received a Supplement relating to the 3090–18E on May 22. The Supplement contained a purchase price calculated on the basis of a 15% educational discount, *not* a 25% discount. Medlantic rejected it.[13] At a May 27 status meeting, Putro again directed IBM to deliver and install the 3090–18E CPU. IBM did so, delivering the equipment to the Data Center on June 1. On June 3, IBM delivered a Supplement amended to reflect, except for the amount of the discount, the changes Medlantic had requested in the May 22 Supplement. There is some dispute as to when the 3090–18E was fully installed, but both parties agree that IBM had completed installation by June 8.

On June 16, Medlantic paid IBM $2,334,686 for the 3090–18E CPU. This amount reflects a 25% educational discount. IBM brought this action to collect $233,140, which is the difference between the 25% discount and the 15% discount.

## ANALYSIS

Medlantic makes essentially three arguments. First, Medlantic argues that the parties had reached agreement as to price on April 2, that the agreement regarding

---

**11.** As noted above, an Agreement for Purchase does not obligate a purchaser to obtain an IBM machine. Medlantic's execution of the 1987 Agreement therefore did not *bind* Medlantic, at that point, to acquire the 3090–18E CPU.

**12.** The record indicates that one of the IBM sales representatives who had originally quoted Medlantic the 25% educational discount became aware of the "error" on, at the latest, May 13. Coleman Dep. at 110. Nevertheless, Medlantic was not notified of the lower discount until May 19. IBM explains by contending that their sales representatives used the time in an effort to obtain the 25% discount through use of the "special bids procedure." Plaintiff's Supplemental Statement of facts in Opposition to Defendant's Allegations of Material Fact at 12 (rebutting ¶ 48).

**13.** There appears to be some question as to whether, in rejecting the May 22 Supplement, Medlantic expressly rejected it on the basis of the 15% discount. Medlantic contends that it rejected the May 22 Supplement because, *inter alia,* the price was "incorrect." Defendant's Statement of Genuine Issues of Material fact in Dispute at ¶ 61. IBM, on the other hand, asserts in its memoranda that, "[s]ignificantly, Medlantic did not take issue with the price specified in the May Supplement." Plaintiff's Reply to Defendant's Opposition to Motion for Summary Judgment at p. 9, n. 15. IBM contends that Medlantic only rejected the Supplement because of certain technical problems, as well as because the Supplement did not reflect Medlantic's decision to lease rather than purchase certain other equipment.

price was memorialized in the April 21 letter, and the execution of the 1987 Agreement on May 11 by IBM completed the contracting process. Second, Medlantic argues that, even if a fully enforceable contract had not been completed by May 11, the doctrine of promissory estoppel requires that Medlantic be given the benefit of a 25% discount. Finally, Medlantic contends that the Price Protection Provision of the 1987 Agreement protects Medlantic from a change in the "generally available" price of the 3090–18E CPU.

IBM, on the other hand, takes the position that the 1987 Agreement and the Supplements, by virtue of the merger and integration clause included in each, contain the exclusive terms of the agreement between the parties. Because the June 3 Supplement—which is expressly incorporated into the 1987 Agreement—contains only a 15% educational discount, IBM contends that Medlantic may not now contradict the terms of the contract by relying upon extrinsic evidence of the incorrect April 2 and April 21 price quotes. Absent such extrinsic evidence, IBM contends, the 1987 Agreement and the Supplement clearly entitle IBM to judgment as a matter of law.

The Court agrees with IBM. The Agreement and the Supplements make clear that, together, they constitute a single, fully integrated contract. Medlantic may not introduce evidence of agreements or understandings that are extrinsic to these documents. This being the case, IBM is entitled to judgment as a matter of law. The Court rejects Medlantic's arguments as to the effect of the Price Protection Provision contained in the 1987 Agreement. Further, the Court disagrees with Medlantic's contention that the parties had reached an agreement on price as a matter of law prior to executing the 1987 Agreement, and that execution of the 1987 Agreement merely completed the contracting process. Finally, the Court disagrees with Medlantic that IBM is estopped by virtue of the April 2 and April 21 price quotes.

### 1. *The Price Protection Provision*

Medlantic contends that it is entitled to a 25% educational discount by virtue of the Price Protection Provision contained in the 1987 Agreement. Medlantic argues that when IBM provided notice on May 19 that the 3090–18E was eligible for only a 15% discount, IBM changed the "generally available" price of the unit within the meaning of the Price Protection Provision. Because this "change" occurred within three months of delivery—indeed, within 12 days of delivery—Medlantic argues that it is entitled to the protections of the provision.

A decision on this issue requires a construction of the term "generally available" price as used in the 1987 Agreement. Medlantic argues that, in the context of this case, "generally available" price must be construed to mean the *discounted* price quoted to Medlantic on April 2. IBM responds that the "generally available" means the list price of IBM products, apart from any discounts or special arrangements.

The Court agrees with IBM. The clear language of the provision compels the conclusion that the term "generally available price" refers, not to the price of the 3090–18E CPU net of any discount, but to the price of a unit *prior* to any discount. Although the Court bases its conclusion principally upon the common meaning of the term "generally"—which seems to exclude any special deals such as that contained in an educational discount—the conclusion derives further support from the fact that, although the Price Protection Provision itself does not affirmatively define the term, it does expressly exclude from the term's definition "prices for sales of Machines under terms and conditions other than those in this Agreement exclusive of any of its Amendments." Thus, the Agreement to Purchase itself clearly excludes from the "generally available" price any prices which might be contained in an "Amendment," such as a Supplement.

However, because an Agreement to Purchase, standing alone, contains no prices of any kind, much less any discount, the *only* place where discount information will be contained is in a pricing Supplement. Yet,

precisely because it is contained in a Supplement, this discount price is expressly excluded from the definition of "generally available" price. What we are left with in an Agreement to Purchase, then, before any "Amendments," is the price *against* which discounts are made. Whatever the appropriate term for this price might be, whether it be "list price" or otherwise, it is clear from the language of the Agreement to Purchase that it is not the *net discounted* price which was quoted to Medlantic on April 2 and April 21. Even assuming that IBM *changed* the amount of the educational discount between April 2 and April 21, rather than merely discovered an error, and thereby arrived at a different net discounted price, that price is simply not the "generally available" price contemplated by the Price Protection Provision. Accordingly, because the Price Protection Provision contained in the 1987 Agreement does not pertain to the prices quoted to Medlantic on April 2 and April 21, Medlantic's argument on this issue must fail.

2. *The Price Quotes Coupled With the 1987 Agreement Did Not Create a Complete Contract*

■ Medlantic contends that IBM committed itself to a 25% educational discount at the April 2 meeting and in the subsequent April 21 letter. Medlantic contends that this agreement on price, when coupled with the acceptance of the comprehensive nonprice terms of the 1987 Agreement on May 11, constituted a complete and binding contract. Thus, Medlantic asserts, because the parties had agreed on all material terms by May 11, the contracting process effectively ended on that date. In Medlantic's view, the Supplement lacks independent legal significance, and constitutes little more than an invoice.

Medlantic's argument fails for two reasons. First, the April 21 letter makes clear that the prices contained therein, reflecting the 25% discount, were for Medlantic's "information only," and were "subject to change." This express qualification makes clear IBM's intention *not* to be bound by the contents of the letter. These qualifications show that the letter did not constitute

an *offer* of the prices contained therein. There is a clear legal distinction between an "offer," the terms and/or circumstances of which make clear that the offeree may accept and thereby create a contractual commitment, and a statement of information. The April 21 letter clearly falls into the latter category. Neither in the letter itself nor anywhere else in the record is there any suggestion that IBM intended by the April 21 letter or the prior meetings to forego its normal process of offer and acceptance, which, as Medlantic was well aware, involved an Agreement for Purchase followed by a Supplement.

Medlantic would avoid the terms of the April 21 letter by pointing to evidence in the record which suggests that IBM's representatives considered IBM "bound" by the April 2 and April 21 representations, as well as evidence that IBM undertook "performance" of the agreement *prior* to disclosure of the incorrect quotes. From this evidence, Medlantic infers IBM's intent to be "bound," notwithstanding the qualification contained in the April 21 letter.

This argument ignores the legal import of the 1987 Agreement, executed on May 11. The 1987 Agreement expressly supersedes "all proposals or prior agreements, written or oral," that IBM and Medlantic may have reached before. Thus, even if the parties had reached a meeting of the minds as to price of the 3090–18E CPU prior to May 11, the 1987 Agreement expressly and unambiguously superseded that meeting of the minds, and subjected the contracting process to the terms contained therein. Upon execution of the 1987 Agreement, the contracting process took a prospective, rather than retroactive, cast; the price of the 3090–18E became a matter for final specification in the Supplement. In short, by executing the 1987 Agreement, IBM and Medlantic wiped the slate clean; any prior arrangements or agreements were effectively voided, and with their signatures the parties agreed to strike a final deal only in the manner specified in the 1987 Agreement.

### 3. *IBM is Not Bound by Principles of Promissory Estoppel*

■ Finally, Medlantic contends that it reasonably relied to its detriment upon IBM's erroneous price quotes. For that reason, Medlantic argues, IBM should be held to its "promise" of a 25% educational discount under the doctrine of promissory estoppel.

The Court is prepared to assume, *arguendo*, that Medlantic has established the essential elements of promissory estoppel.[14] The Court, however, regards this fact as ultimately irrelevant. IBM has shown that the parole evidence rule would work to exclude evidence of any prior promises or agreements, and, in this Court's view, IBM's showing controls as against any claim of promissory estoppel.

The relationship between the doctrine of promissory estoppel and the parole evidence rule is less than clear. *See, e.g.,* Metzger, *The Parole Evidence Rule: Promissory Estoppel's Next Conquest?*, 36 Vand.L.Rev. 1383 (1983). Courts have suggested that principles of estoppel may override unambiguous integration clauses, and have therefore considered evidence of prior agreements notwithstanding contractual language expressly invalidating such agreements. *See, e.g., Ehret Co. v. Eaton, Yale & Towne, Inc.,* 523 F.2d 280, 283–84 (7th Cir.1975) (mingling doctrines of promissory estoppel and equitable estoppel to defeat an integration clause); *Cf., Prudential Ins. Co. v. Clark,* 456 F.2d 932, 937 (5th Cir.1972) (where promissory estoppel applies, prior oral representation may create a "separate enforceable promise" outside the terms of the integrated contract). On the other hand, courts have also held that an integrated written contract controls

as against any and all prior inconsistent oral agreements or promises; such a contract nullifies the effect that promissory estoppel might otherwise have. *See, e.g., Durkee v. Goodyear Tire & Rubber Co.,* 676 F.Supp. 189, 192 (W.D.Wis.1987) ("To entertain a theory of recovery that makes a prior, inconsistent promise enforceable is to write the [parole evidence] rule out of existence."); *Kinn v. Coast Catamaran Corp.,* 582 F.Supp. 682, 687 (E.D.Wis.1984) ("In the circumstances of this case ... the parole evidence rule does not permit [plaintiff] to make use of ... prior oral representations, and prevents him from raising a viable promissory estoppel argument."); *Wojciechowski v. Amoco Oil Co.,* 483 F.Supp. 109, 115 (E.D.Wis.1980) ("[T]he parole evidence rule nullifies the salutory effects of the doctrine of promissory estoppel.").

The Court agrees with the reasoning and results of the latter line of cases. If prior oral representations, even those reasonably relied upon to the promissee's detriment, could be used to defeat the express terms of a subsequent written agreement, the parole evidence rule would be, as a practical matter, reduced to nothing. In this Court's view, the knowing execution of a written contract containing an integration clause is a legally meaningful act. Thus, when Medlantic—possessed of its own cadre of lawyers and experienced businessmen—executed the 1987 Agreement, it committed itself to the terms of that contract, including those which expressly negated any prior agreements and which provided that the price of the 3090–18E CPU would be contained only the Supplement. *See* 3 A. Corbin, Corbin on Contracts § 578 (1960) ("By limiting the contract to the provisions that are in writing, the parties

---

**14.** Even though the Court assumes the existence of promissory estoppel for present purposes, the facts call into substantial question the reasonableness of Medlantic's reliance upon IBM's statements, if in fact such reliance actually occurred. First, the disclaimer contained in the April 21 letter—which was requested by Putro—should have put Medlantic on notice that continued reliance upon the 25% discount quote was questionable. *See, e.g., Chromalloy Am. Corp. v. Universal Housing Systems,* 495 F.Supp. 544, 551 (although greater number of disclaim-

ers involved than in the instant case, court found that such disclaimers negated reasonableness of reliance). Second, Medlantic's execution of the 1987 Agreement—with its express invalidation of prior agreements or understandings—arguably should have put Medlantic on notice that continued adherence to the 25% discount quote was questionable. *See Mack v. Earle M. Jorgensen Co.,* 467 F.2d 1177, 1179 (7th Cir.1972) (reliance unreasonable where subsequent written agreement contradicted prior oral agreements).

are definitely expressing an intention to nullify antecedent understandings or agreements.... Therefore, even if there had in fact been an antecedent warranty or other provision, it is discharged by the written agreement.").

Not surprisingly, Medlantic contends that that the parole evidence rule is inapplicable in this case, and that application of the rule therefore cannot trump Medlantic's promissory estoppel argument. In an effort to evade the import of the integration clause contained in the 1987 Agreement, Medlantic argues that because the 1987 Agreement lacks a specific price term, Medlantic may introduce evidence of IBM's representations in order to show the parties' *actual*, prior agreement on price. To do so, Medlantic suggests, would not be to vary or contradict the terms of the 1987 Agreement, but would instead serve only to *explain* the complete understanding of the parties as fully fleshed out in the 1987 Agreement.

Again, however, Medlantic ignores the plain language of the 1987 Agreement. The 1987 Agreement clearly states (1) that it is merely the first step in a two-step contracting process; and (2) that the price of the 3090–18E CPU would be provided in the Supplement. Thus, contrary to Medlantic's assertion, evidence of the alleged prior oral agreement as to price would flatly contradict the 1987 Agreement in two respects. First, it would be offered to prove the existence of a completed contract at the time of the 1987 Agreement's execution. This, however, would be inconsistent with the clearly articulated contracting process, which involves first an Agreement for Purchase, followed by a Supplement. Second, it would serve to import a price term into an agreement which expressly disclaims such a term, and which expressly references a second document—the Supplement—as the source of that price term. This being the case, it is apparent that Medlantic seeks to introduce evidence of IBM's representations, not for the purpose of explaining the 1987 Agreement, but for the purpose of contradicting the terms and operation of that document. Such a purpose is prohibited by the parole evidence rule.

## CONCLUSION

The thrust of this case has involved Medlantic's efforts to evade the import of the integration clauses contained in the 1987 Agreement and the Supplement. The Court rejects each of these efforts, and finds that the integration clauses—or, more accurately, the parole evidence rule which they embody—preclude introduction of evidence relating to any prior representations or agreements as to price which IBM or Medlantic may have reached. Absent such evidence, the contract created by the 1987 Agreement and the Supplement stand alone, and clearly entitle IBM to summary judgment as a matter of law. The Court so holds. An Order consistent with the foregoing shall issue of even date herewith.

## ORDER

For the reasons stated in the Opinion issued of even date herewith, it is, by the Court, this 16 day of March, 1989,

ORDERED, that the motion of the plaintiff for summary judgment in the above-captioned matter shall be GRANTED, and that of the defendant DENIED; and it is further

ORDERED, that the above-captioned matter shall be removed from the dockets of this Court.