Fred MASHACK, t/a Mashack
Iron Works, Appellant,

v.

SUPERIOR MANAGEMENT
SERVICES, INC.,
Appellee.

No. 01–CV–27.

District of Columbia Court of Appeals.

Argued March 5, 2002.
Decided Sept. 26, 2002.

Patrick G. Merkle, Washington, DC, for appellant.

Daniel M. Press, McLean VA, for appellee.

Before WAGNER, Chief Judge, and STEADMAN and WASHINGTON, Associate Judges.

STEADMAN, Associate Judge:

This appeal arises out of a subcontract entered into on May 1, 1996 between Superior Management Services ("SMS") and Fred Mashack, t/a Mashack Iron Works, ("Mashack") calling for the repair of 12 damaged grates and the replacement of 38 grates using stainless steel.[1] Subsequently, inconclusive discussions took place about several aspects of the proposed work, including the feasibility of repairing the 12 grates rather than replacing them and about substituting carbon steel for stainless steel.[2] Eventually matters came to a head at a meeting between Mashack and SMS on August 12, 1996, when SMS orally instructed Mashack to proceed under the original contract and fabricate only the new 38 grates, substituting carbon steel for stainless steel.[3] Without sufficient justification, as the trial court found, Mashack refused to agree to do so. In a letter the next day, August 13, 1996, SMS reiterated these instructions and demanded that Mashack within 72 hours confirm his intent to proceed or the contract would be terminated. Mashack did not do so and the contract was terminated.[4]

Subsequently, SMS brought this suit against Mashack seeking damages for breach of contract for failure to perform. Mashack counterclaimed, asserting breach by SMS. After a bench trial, the court entered judgment in favor of SMS in the amount of $33,580 as damages for the breach[5].

---

1. These grates covered the moat surrounding the Internal Revenue Service building on Constitution Avenue. The federal government acting through the General Services Administration (GSA) entered into the prime contract with SMS.

2. All the principals knew that using carbon steel would require joining two pieces by using screws (a process apparently also referred to as "drill and tap") rather than by welding. The cost of carbon steel is less than stainless but the drill and tap method is more labor-intensive. A two-piece design was also involved. The subcontract was essentially for labor; SMS was responsible for supplying the steel.

3. The trial court reasonably found that these changes were permitted under the applicable contract terms.

4. This statement of facts is in highly abbreviated form. The parties were in serious disagreement about many aspects of the relevant events and the trial involved a number of quite technical aspects. This shorthand recitation of what appear to us as the most relevant facts to an immediate understanding of the litigation, as well as the further facts set forth in this opinion, reflect the trial court's findings by which we are bound on the record here.

5. SMS also sought attorneys fees incurred as a result of a suit improperly brought by Mashack against SMS in Maryland. Mashack does not contest his liability for the payment of those fees, which the trial court set at $3,200. The final judgment entered by the trial court, however, was for $37,780, which is $1,000 higher than the two components. This apparent error can be re-examined on remand.

Although Mashack's principal arguments on appeal relate to the computation of damages, he also challenges the trial court's conclusion that he, rather than SMS, breached the contract. We affirm the trial court's ruling on Mashack's liability for breach, but remand the case for further examination of the issue of damages.

## I.

■ Mashack first argues that SMS had no right under the contract to demand that Mashack confirm his intent to proceed, and hence he did not breach the contract on August 13th. The trial court cited to the relevant contractual provisions common in government contracting dealing with the right to make changes, the duty to proceed notwithstanding disputes, and authorizing termination for refusal to prosecute the work. The trial court quite permissibly determined that, in light of the disputes between the parties that occurred on August 12th, a confirmation request was reasonable and a failure to confirm could be treated as definitive proof that Mashack would not proceed. (Indeed, quite apart from the contract terms, a clear refusal by a party to perform a contract may be treated as an anticipatory breach or repudiation by the other party to the contract. *See Reiman v. International Hospitality Group, Ltd.*, 614 A.2d 925, 928 (D.C.1992) (citation omitted).)

■ Mashack also argues that SMS itself wrongfully terminated the contract when it entered into a cover contract with Master Steel Products ("MSP") prior to the expiration of the three-day response period.[6] There was a dispute as to when exactly the replacement contract became effective, and the trial court found it unnecessary to make such a determination. Since, as the trial court found, Mashack never confirmed his intent to proceed within the allotted 72 hours and because he was unaware of the replacement contract with MSP, he suffered no harm. Furthermore, we do not agree with Mashack's argument that SMS's action in itself constituted a breach of the subcontract. A party concerned about an apparent unwillingness or inability of another party to proceed with a contract should be able, even prior to a breach, to arrange for appropriate "cover." It may be, to be sure, that the covering party, if it imprudently enters into a firm replacement contract, may end up being liable on both contracts if the original contract is not in fact breached, but it does not follow that the cover contract itself constitutes a breach of the original contract. We are not directed to any contrary case law nor to any provision of the Mashack–MSP subcontract that turns SMS's subsequent action of entering into the contract with MSP into a breach of the subcontract, even if the cover contract in fact was effective prior to the end of the 72–hour period.[7]

## II.

■ We now turn to the computation of damages. In a breach of contract action, the measure of damages that a court must apply is "the amount necessary to place the non-breaching party in the same position he or she would have been in had the contract been performed." *Rowan Heating–Air Conditioning–Sheet Metal v. Williams*, 580 A.2d 583, 585 (D.C.1990);

---

6. The trial court itself noted that Mashack did not make this argument to it. Nonetheless, the trial court addressed and ruled on the point and we therefore may take cognizance of it on this appeal as well.

7. It could be that knowledge of the cover contract might have deterred Mashack's confirmation of intent to proceed, but that is not the factual situation here.

*see* RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981).[8] The trial court determined that SMS was entitled to $33,580 in damages for the breach. The court arrived at this number by subtracting the original contract price with Mashack, $67,500, from the adjusted cover contract price with MSP, $101,080. This adjusted contract price with MSP was calculated by reducing the total MSP contract price of $133,000 by 24% ($31,920) in order to account for the fact that the original contract with Mashack called for the fabrication of only 38 grates and the cover contract with MSP called for the fabrication of 50 grates.

■■ When this court reviews a damage award "so long as a plaintiff provides 'some reasonable basis on which to estimate damages,' the [fact-finder's] award of damages will not be disturbed on appeal." *Columbus Properties, Inc. v. O'Connell,* 644 A.2d 444, 447 (D.C.1994) (quoting *Romer v. District of Columbia,* 449 A.2d 1097, 1100 (D.C.1982)). An appellate court should not re-weigh the evidence and should uphold the award unless it lacks support from any competent credible evidence. *Id.*

The principal challenge[9] that appellant makes to the trial court's computation is the failure to take into account that the MSP contract called for a different procedure to be used in the fabricating process. Specifically, Mashack argues that the drill and tap method of fabrication and the related two-piece design found in the replacement contract with MSP using carbon steel was much more costly to perform than the welding method with stainless steel provided for in Mashack's original $67,500 contract and the increased costs were attributable to this change.[10] In effect, his argument goes, to use the two contract figures without an adjustment for the difference in work is to compare, if not apples and oranges, at least two distinct varieties of apples.

The trial court indeed had found that the original $67,500 dollar contract with Mashack was based on a single member frame with stainless steel that was to be assembled through welding, whereas the $133,000 dollar contract with Master Steel was for a two-piece design with carbon steel that would be assembled through a drill and tap method. In determining that the modified contract did not employ the same method of fabrication as the original contract, the trial court had further noted that this change may have resulted in a price increase. Indeed, at trial, varying opinions on the difficulty and cost of the adjusted method versus the original meth-

8. In *Rowan,* we further noted that "[w]here a party fails to complete a service which it agreed to perform under a contract, the non-breaching party is entitled to receive the amount it costs to complete the service, to the extent that amount exceeds the original contract price." 580 A.2d at 585, citing *Thorne v. White,* 103 A.2d 579, 580 (D.C.1954). In that case, a roofing contractor defaulted, and the replacement contractor did work beyond that called for by the original contract. In reversing an award of damages equal to the entire amount paid to the replacement contractor in excess of the original contract cost, we made clear that the damages could not exceed what it cost to complete the same work called for by the original contract.

9. Appellant also suggests that since the MSP contract was never in fact performed (SMS terminated the MSP contract for breach), its pricing was entirely irrelevant for that reason alone. We are unable to find in the record before us any indication that this argument was made to the trial court and we therefore do not address it on this appeal. *See, e.g., Bell v. United States,* No. 99–CM–1296, slip op. at 8–9, 2002 WL 2018827 (D.C. Sept.5, 2002).

10. In both cases, it appears that the cost of the steel was borne by SMS, not the subcontractor. See note 2, *supra.*

od had been adduced, and the trial court determined that "[t]he evidence discloses that the drill and tap method ultimately used was more difficult and costly." To be sure, in another portion of its order, also not dealing directly with the damages issue, the trial court took note of the fact that Mashack realized savings on the original contract by not having to rework the twelve grates, and the court may have thought that these savings offset the added costs of drill and tap. However, in the single paragraph of the order devoted to damages, there is no express articulation of this view nor any even rough quantification of these factors. On its face, the damages computation appears to assume comparability in the respective contractual provisions on the required work method. We think that Mashack justifiably argues that further exploration and explanation of the damages computation may be asked of the trial court.

Accordingly, we uphold the judgment with respect to appellant's liability for breach of contract but remand the case for further consideration of the damages issue.