**BUILDING SERVICES CO., Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, Defendant.**

**National Railroad Passenger Corporation, Counter–Plaintiff,**

v.

**Building Services Co., Counter–Defendant.**

**Civil Action No. 02–564 (RBW).**

United States District Court, District of Columbia.

Feb. 18, 2004.

Tony O. Shaw, Washington, DC, for Plaintiff/Counter–Defendant.

Christine E. Lanzon, National Railroad Passenger Corporation, office of General Counsel, John T. Bergin, Seyfarth Shaw, Washington, DC, for Defendant/Counter–Claimant.

### MEMORANDUM OPINION

WALTON, District Judge.

The parties in this matter had entered into an agreement wherein the Building Services Company ("BSC") contracted with the National Railroad Passenger Corporation ("Amtrak") to provide cleaning services at Amtrak's New Carrolton, Maryland station ("Station"). BSC initiated this lawsuit, claiming, *inter alia*, that Am-

trak breached their contact. This matter is now before the Court on Amtrak's motion for summary judgment. For the reasons set forth below, the Court will grant Amtrak's motion.

### I. *Factual Background*

#### (A) *The Contract*

In June of 1999, Amtrak issued a Purchase Order to BSC that resulted in BSC agreeing to provide cleaning services for Amtrak at its New Carrolton station from July 1, 1999 to June 30, 2001. Statement of Material Facts as to Which There is No Genuine Issue in Support of Motion of National Railroad Passenger Association for Summary Judgment ("Amtrak's Stat. of Facts") ¶3; Motion of National Railroad Passenger Association for Summary Judgment ("Amtrak's Mot."), Exhibit ("Ex.") 1; Statement of Genuine Material Facts In Dispute ("BSC's Stat. of Disp. Facts") ¶1. The Purchase Order specifically included language indicating that it was subject to the terms and conditions of an Amtrak form ("Form 69") and four other documents that were attached to the Purchase Order.[1] Amtrak's Mot., Ex. 1. Paragraph 8 of Form 69 provides in pertinent part:

> DEFAULT—(A) Amtrak may, . . . by written notice of default to [BSC], terminate the whole or any part of this Order in any one of the following circumstances: if [BSC] (1) fails to make delivery of the Supplies [2] within the time specified herein as "delivery date" or

1. A note at the bottom of the Purchase Order states: "THIS PURCHASE ORDER IS SUBJECT TO THE TERMS AND CONDITIONS AS DETAILED IN NRPC FORM NUMBER 69, REVISED 8/91 AND EXHIBITS ONE (1) THROUGH FOUR (4) AS ATTACHED ___, ALREADY IN YOUR POSSESSION √, OR AS OTHERWISE NOTED IN THE BODY OF THIS PURCHASE ORDER." Amtrak's Mot., Ex. 1 (statement on bottom of page 1).

2. As defined in Paragraph 1(C) of Form 69, " 'Supplies' means the material, articles, services or other items ordered by this Purchase Order, whether specifically manufactured or not." Amtrak's Stat. of Facts ¶6, Amtrak's Mot., Ex. 1. Here, "Supplies" refers to the cleaning services BSC agreed to provide.

any extension thereof; or (2) fails to perform any of the other provisions of this Order, or (3) so fails to make progress as to endanger performance of this Order in accordance with its terms. At its sole option, Amtrak may require a cure of the failure involved rather than terminating the Order in whole or in part. If [BSC] does not cure the failure within the period specified by Amtrak, then Amtrak shall have the right at that time to terminate the whole or any part of the Order. (B) In the event Amtrak terminates this Order in whole or in part as provided in subsection 8(A) above, Amtrak may procure, upon such terms and in such manner as Amtrak may deem appropriate, Supplies similar to those so terminated and [BSC] shall be liable to Amtrak for any excess costs for such similar Supplies. . . . [3]

Amtrak's Stat. of Facts ¶ 5; Amtrak's Mot., Ex. 1. In addition, a default notice was inserted on the first page of the Purchase Order; this notice stated:

AMTRAK MAY TERMINATE THIS PURCHASE ORDER FOR DEFAULT AND/OR REFUSE TO ACCEPT DELIVERED MATERIAL AND/OR SERVICES WITHOUT ANY FURTHER NOTICE IF COMPANY FAILS TO MAKE DELIVERY OF THE ORDERED MATERIAL AND/OR SERVICES WITHIN THE TIME SPECIFIED IN THE PURCHASE ORDER . . .

Amtrak's Stat. of Facts ¶ 4; Amtrak's Mot., Ex. 1. The next section of Form 69, Paragraph 9, which is entitled "Termination," permits the Purchase Order to "be terminated or suspended in whole or in part from time to time and at any time for the convenience of Amtrak." Amtrak's Stat. of Facts ¶ 6; Amtrak's Mot., Ex. 1. Finally, Paragraph 19 of Form 69 provides that the Purchase Order "will be interpreted in accordance with Section 306(d) of the Rail Passenger Service Act (Public Law 91–518), which requires that all leases, contracts and purchase orders entered into by [Amtrak] be governed by the laws of the District of Columbia." Amtrak's Mot., Ex. 1.

The Purchase Order states that the services BSC was to provide for Amtrak included:

STATION AND GENERAL SERVICES . . . MONTHLY CLEANING OF THE NEW CARROLLTON MD. STATION, WINDOWS, REAR WAITING ROOM, STEPS TO PLATFORM, ESCALATORS, ELEVATORS, AND THE SURROUNDING AREAS WHICH MUST BE CLEANED DAILY TO MAINTAIN AN ODOR [FREE] AREA. WORK SCOPE PER ATTACHMENT "A" PP 1 THRU 6 DATED 7–1–99 ALREADY IN YOUR POSSESSION.

Amtrak's Mot., Ex. 1. Attachment A of the Purchase Order specifically details the janitorial services to be performed at the Station, including: (1) daily service of the rest rooms; (2) daily as well as additional weekly service of waiting rooms, entrances and corridors; (3) weekly dusting of all surfaces in the ticket office area as well as daily cleaning of its floors, doors, partitions, and trash cans; (4) daily cleaning of the elevators, stairs, and loading platform; (5) daily cleansing and quarterly recondi-

---

**3.** Subsection (C) of Paragraph 8 provides that "[n]either party shall be liable for defaults or delays due to causes beyond its control and without its fault or negligence . . . *provided* that whenever a party has knowledge of any actual or potential force majeure is delaying or threatens to delay the timely performance of this Order, it shall promptly give notice to the other. . . ." Amtrak's Mot., Ex. 1. This section, however, is not raised as a defense by BSC.

tioning treatment of outside entrances; (6) monthly cleaning of the windows; (7) quarrying of the tile floor; and (8) daily removal of the trash. In addition, Attachment A states that materials necessary to complete these services are to be furnished by BSC. Finally, Attachment A mandated the hours of the day and the days of the week when the services would be performed. Amtrak's Mot., Ex. 1.[4]

### (B) *Plaintiff's Performance Pursuant to the Purchase Order*

Jamie Wilson ("Wilson"), Amtrak's Lead Clerk at the Station, was responsible for ensuring that the New Carrolton station was properly cleaned and maintained, and therefore "had the opportunity to closely observe the performance of BSC under the contract on an almost daily basis." Amtrak's Mot., Wilson Aff. ¶¶ 1–2. Wilson observed that BSC was not performing its services properly, "leading to unclean and unsafe conditions at the Station." *Id.* at ¶ 3. These observations resulted in Wilson recording her observations and conversations with BSC employees in a journal after noticing defects in BSC's performance, which she attached to her affidavit.[5] *Id.* at ¶ 4. According to her journal, BSC employees (1) failed to show up on time for shifts and sometimes even failed to appear for work at all, (2) used Amtrak supplies instead of providing their own, (3) failed to clean (sweep, mop, etc.) floors of the Station lobby, hallways, and restrooms, (4) were found sleeping during their shifts, (5) argued with Amtrak passengers, and (6) impersonated an Amtrak employee on at least one occasion. Amtrak's Stat. of

Facts ¶¶ 7–11; Amtrak's Mot., Wilson Aff. ¶¶ 4–5, Ex. A. These observations led Wilson to conclude that "BSC repeatedly and continuously failed to adequately perform many of its duties under its cleaning contract with Amtrak, leading to unclean and unsafe conditions at the Station." Amtrak's Mot., Wilson Aff. ¶ 3; Amtrak's Stat. of Facts ¶ 7.

Moreover, Amtrak alleges that Wilson informed BSC's employees and its Chief Operating Officer, Dag Nyanfore ("Nyanfore"), through both oral and written communications, about the problems she observed on numerous occasions. Amtrak's Mot., Wilson Aff. ¶¶ 3, 11–12 and Aff. Ex. A, B; Amtrak's Stat. of Facts ¶ 13. Nonetheless, Wilson failed to notice any subsequent improvements in BSC's performance even though she was promised that BSC would remedy the situation. Amtrak's Stat. of Facts ¶ 13; Amtrak's Mot., Wilson Aff. ¶¶ 3, 11 and Aff. Ex. B. Additionally, Amtrak officials met with Nyanfore on May 25, 2000, to discuss BSC's performance problems. Amtrak's Stat. of Facts ¶ 14; Amtrak's Mot., Wilson Aff. ¶ 12. Lastly, Amtrak claims that the cleanliness of the Station improved significantly once the new cleaning service assumed responsibility. Amtrak's Mot., Wilson Aff. ¶ 9.

In its defense, BSC asserts that it never received notice of any concerns about its performance, and, if it did, the problems were corrected at that time. BSC's Stat. of Disp. Facts ¶ 13; Memorandum of Points and Authorities In Support of Plaintiff's Opposition ("BSC's Opp'n.") at 2–3;[6]

---

4.  BSC does not dispute nor address the applicability of the terms and conditions set forth in the documents attached to the Purchase Order.

5.  The recorded observations that Wilson attached to her affidavit were transcribed from her journal; she did not attach her actual

journal to her affidavit. Amtrak's Mot., Wilson Aff. ¶ 4.

6.  The Court notes that the pages of the plaintiff's opposition were not numbered; as such, this Court had to assign numbers to the pages based on the order in which they were submitted.

Nyanfore Aff. ¶¶ 5–6, 10–11. In addition, BSC claims that prior to making its request for an additional payment of $6,000 for the performance of services rendered in addition to those services specifically delineated in the Purchase Order, Wilson and another Amtrak employee, Don Peterson ("Peterson"), praised the performance of its employees. BSC's Stat. of Disp. Facts ¶ 7; BSC Opp'n at 3, 6; Nyanfore Aff. ¶¶ 12–13.[7] Furthermore, BSC counters Wilson's assessment of its performance with regards to the cleaning of the Station's floors, suggesting that "the nature, and quality ..." of the floors caused them to "appear" dirty even though they had been properly cleaned. BSC's Stat. of Disp. Facts ¶ 6; BSC's Opp'n., Ex. D; Nyanfore Aff. ¶¶ 6–8. Moreover, BSC claims that the complaints about the floors ceased after they applied a product recommended by a professional floor consultant. Nyanfore Aff. ¶ 8. And, BSC questions the validity of the observations contained in Wilson's journal, declaring them contrary to the sworn statements of Nyanfore. BSC's Opp'n. at 4. Also, BSC pointed out that although in a November 18, 1999 letter Nyanfore acknowledged Wilson's expressed disapproval of BSC's services, it noted that the letter indicated the condition of the floor was the reason for its appearance. BSC's Opp'n., Ex. D.

The Court notes that BSC has failed to respond to Amtrak's contention that BSC employees either showed up late for their shifts or failed to appear at all. Nowhere in BSC's filings does it address these complaints regarding its employees.

(C) *Additional Work Allegedly Performed by BSC*

In exchange for the services BSC was obligated to perform pursuant to the Pur-

chase Order, BSC contracted to receive fixed monthly payments of $4,000. In addition, the Purchase Order provided for supplemental compensation at the hourly rate of $7.73, with possible maximum compensation of up to $6,000, for any services "provided by BSC that was not listed in Attachment 'A'. . . ." Amtrak's Mot. at 9, Ex. 1 (Purchase Order at 2); BSC's Stat. of Disp. Facts ¶ 3. However, the Purchase Order specifically states that such "additional work" must be both "requested and approved by Amtrak [employee] Ken Wiedel." *Id.*

In June 2000, BSC submitted an invoice for payment of $6,000 in addition to the monthly amount it was owed at that time. Amtrak's Stat. of Facts ¶ 15; Amtrak's Mot., Wilson Aff. Ex. D; BSC's Opp'n. at 4–5. BSC contends that it was entitled to the extra compensation for "additional work" requested by Amtrak employee Wilson, whom they allege represented Ken Wiedel at the New Carrolton station. BSC's Stat. of Disp. Facts ¶¶ 4–5; Nyanfore Aff. ¶¶ 9, 17. However, Amtrak posits that Wilson and Wiedel never requested or authorized that any additional work be performed by BSC. Amtrak's Stat. of Facts ¶ 16; Amtrak's Mot., Wilson Aff. ¶ 15, Ex. D. Indeed, Wilson states in her affidavit, "I never personally requested or authorized BSC to perform such work, and did not observe BSC performing such work." Amtrak's Mot., Wilson Aff. ¶ 15, Ex. E. Furthermore, Amtrak points out that "BSC never produced any supporting detail showing the nature of the work, the dates it was performed, by whom, the number of hours spent, or any other supporting information." Amtrak's Stat. of Facts ¶ 15; Amtrak's Mot., Wilson Aff.

---

**7.** BSC also attempts to rely on its Exhibit B in support of its claim that Amtrak praised the performance of its employees; however, there

was no Exhibit B submitted to the Court with plaintiff's opposition. *See* BSC's. Stat. of Disp. Facts ¶¶ 4, 7, 8.

¶ 14, Ex. E. Because of these omissions, Amtrak refused to pay the additional $6,000. *Id.;* BSC's Opp'n., Ex. I.[8]

**(D)** *Termination of the Purchase Order*

The Purchase Order between Amtrak and BSC was not scheduled to expire until June 30, 2001. Amtrak's Mot. at 2, Ex. 1 (Purchase Order at 2); Amtrak's Stat. of Facts ¶ 3; BSC's Stat. of Disp. Facts ¶ 1. Nonetheless, in June of 2000, Amtrak issued a Request for Quotation ("RFQ"), which afforded companies the opportunity to bid "for a firm, price contract for cleaning services at the Station." Amtrak's Stat. of Facts ¶ 18; Amtrak's Mot. at 4, Wish Aff. ¶ 4, Ex. A. The "scope of services" described in the RFQ was identical to services delineated in Amtrak's Purchase Order with BSC. Amtrak's Stat. of Facts ¶ 19; Amtrak's Mot., Wish Aff. ¶ 4, Ex. A.

Amtrak received a total of six bids for the cleaning contract, including a bid from BSC, which had been permitted by Amtrak to re-submit a bid. Amtrak's Mot., Wish Aff. ¶ 4–5. Young Cleaning Services ("Young") was the lowest bidder at $6,665 per month and consequently was awarded the contract by Amtrak. On the other hand, BSC's bid was for $8,569 per month, which was more than double what it had received under the Purchase Order agreement it had previously entered into with Amtrak. Amtrak's Stat. of Facts ¶¶ 20–22; Amtrak's Mot., Wish Aff. ¶ 5. In July of 2000, Amtrak terminated the BSC Purchase Order, in accordance with the default provision of paragraph 8 of Form 69. Amtrak's Mot. at 4, Ex. 4. As a result of terminating the BSC Purchase Order, Am-

trak paid Young $2,665 more per month than it would have paid under its Purchase Order with BSC. Therefore, over the eleven months (August 2000 to June 2001) when BSC would have performed the cleaning services pursuant to the Purchase Order Amtrak had issued to it, Amtrak incurred additional expenses of $29,315 over what it otherwise would have paid BSC. Amtrak's Stat. of Facts ¶ 22; Amtrak's Mot., Wish Aff. ¶ 7. These additional expenses are the subject of Amtrak's counterclaim. Amtrak's Mot. at 18–19.

**II.** *Standard of Review for Summary Judgment*

Summary Judgment is generally appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In assessing a summary judgment motion, the Supreme Court has explained that a trial court must look to the substantive law of the claims at issue to determine whether a fact is "material," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and must treat a "genuine issue" as "one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action," *Sanders v. Veneman,* 211 F.Supp.2d 10, 14 (D.D.C.2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

While it is understood that when considering a motion for summary judgment a court must "draw all justifiable inferences

---

8. BSC has provided to the Court minutes of a meeting that was held by the parties on May 25, 2000. The minutes include statements that BSC alleges support its position that Amtrak both praised its work and was aware of the additional work it performed. However, the Court finds this document to lack credibility because it is not signed, nor is it a sworn statement. BSC's Opp'n., Ex. F.

in the nonmoving party's favor and accept the nonmoving party's evidence as true," *Greene v. Amritsar Auto Servs. Co.*, 206 F.Supp.2d 4, 7 (D.D.C.2002) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505), the non-moving party must establish more than "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position," *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. To prevail on a summary judgment motion, the moving party must demonstrate that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "Even when material facts are in dispute, however, summary adjudication may be appropriate if, with all factual inferences drawn in favor of the nonmovant, the movant would nonetheless be entitled to judgment as a matter of law." *Young Dental Mfg. Co. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1141 (Fed.Cir.1997) (citing *Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1572–73 (Fed.Cir.1994)). The District of Columbia Circuit has stated that the non-moving party may not rely solely on mere conclusory allegations. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir.1993). Thus, "[i]f the evidence is merely colorable ..., or is not significantly probative ..., summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### III. *Legal Analysis*

Amtrak seeks summary judgment based upon its assertion that BSC has not met its burden to establish by a preponderance of the evidence any of its three claims— breach of contract, promissory estoppel, and fraud. Additionally, Amtrak believes that it is entitled to summary judgment on its counterclaim. The Court will address each claim separately, and, for the reasons set forth below, will grant Amtrak summary judgment on each of BSC's claims and on its counterclaim.

### (A) *BSC's Breach of Contract Claim*

To prove that Amtrak breached the Purchase Order it issued to BSC, BSC must show that either Amtrak did not have justification for terminating the agreement or that Amtrak failed to perform as required by the agreement.[9] *See Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 729 (D.C.2003) (citing *Fowler v. A & A Co.*, 262 A.2d 344, 347 (D.C.1970) ("[t]he hornbook definition of the term 'breach of contract' is 'an unjustified failure to perform all or any part of what is promised in a contract' ") (internal quotation marks and citation omitted)). Because there exists no genuine issues of material fact regarding BSC's performance pursuant to the Purchase Order, and as BSC has failed to show either that Amtrak did not have justification to terminate the contract or that Amtrak failed to perform its obligations under the agreement, BSC's breach of contract claim cannot survive Amtrak's challenge.

### (1) Amtrak Had the Right to Terminate the Contract Because BSC Defaulted When It Failed to Provide the Services Required by the Purchase Order.

The failure of BSC to fulfill one of its several obligations under the Purchase Order is sufficient grounds for Amtrak to

---

9. The Court will not address Amtrak's position that BSC cannot demonstrate that it has sustained any injury as further grounds for granting its summary judgment motion on the breach of contract claim in light of the Court's conclusion that Amtrak was justified in terminating the Purchase Order.

terminate the agreement for default pursuant to the Purchase Order's terms and conditions. *Id.;* Amtrak's Mot., Ex. 1 (Form 69, paragraph 8). BSC's failure to satisfy some of the requirements of the Purchase Order constituted a default. *Id.* Because "[f]actual disputes that are irrelevant or unnecessary will not be counted" when addressing a summary judgment motion, *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, proof of any undisputed default eliminates the need to resolve other disputed transgressions and alone can serve as justification for terminating a contract. In other words, "where the *undisputed facts* demonstrate that one party is entitled to judgment as a matter of law, summary judgment in favor of that party is entirely appropriate." *Hong v. Children's Mem'l Hosp.,* 993 F.2d 1257, 1263 (7th Cir.1993) (citing *Collins v. American Optometric Ass'n,* 693 F.2d 636, 639 (7th Cir.1982)).

■ In this case, Amtrak terminated the Purchase Order due to the following breaches: (1) failure of BSC employees to timely report to work or not reporting at all; and (2) failure of BSC to provide adequate cleaning services as required by the Purchase Order. Amtrak's Stat. of Facts ¶¶ 7-9, 17; Amtrak's Mot. at 3-4, and Wilson Aff. at ¶¶ 4-5. The services BSC was obligated to provide are clearly listed in the parties' agreement. In addition, the days and times when the cleaning service were to be performed were also set forth in the agreement. Ms. Wilson telephoned BSC on numerous occasions to report that its employees had not reported to work on time or had not reported at all. BSC has neglected to respond to these alleged reporting deficiencies by its employees in its opposition. This Court's Local Rule 7(b) states:

> Within 11 days of the date of service or at such other time as the court may direct, an opposing party shall serve and

file a memorandum of points and authorities in opposition to the motion. If such a memorandum is not filed within the prescribed time, the court may treat the motion as conceded.

D.D.C. R. 7(b). "It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries,* 284 F.Supp.2d 15, 25 (D.D.C.2003) (Walton, J.) (citing *FDIC v. Bender,* 127 F.3d 58, 67–68 (D.C.Cir.1997); *Stephenson v. Cox,* 223 F.Supp.2d 119, 120 (D.D.C.2002)) The District of Columbia Circuit has stated that "the discretion to enforce ... [R]ule [7(b) ] lies wholly with the district court," *Bender,* 127 F.3d at 67–68 (citing *Twelve John Does v. District of Columbia,* 117 F.3d 571, 577 (D.C.Cir.1997)), and noted that it "ha[s] yet to find that a district court's enforcement of this rule constituted an abuse of discretion," *id.* (citations omitted). Here, because BSC had adequate opportunity to address the contention that its employees had not been punctual and sometimes had not reported to work at all, but nevertheless failed to respond to these allegations, the Court will treat these claims as conceded. Standing alone, this concession is sufficient to establish BSC's failure to comply with the contract and Amtrak's right to terminate it.

Although the parties dispute whether other aspects of BSC's performance served as additional justifications for terminating the contract, such as the quality of the cleaning services rendered, these factual disputes are no longer material or necessary to the resolution of Amtrak's motion. As the Court in *Hong* noted, "[a] factual dispute does not preclude summary judgment unless, of course, the disputed fact is

outcome determinative under the governing law." 993 F.2d at 1263 (citing *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983)). In *Hong,* the Seventh Circuit addressed a situation in which the defendant allegedly issued the plaintiff seven different notices detailing repeated problems with her work performance, some of which were in dispute. 993 F.2d at 1263–64. Affirming the district court's grant of summary judgment for the defendant, the Court found that "[a] disagreement over the correct version of events culminating in *one* of the notices—even if we view the evidence, as we must, in a light most favorable to the plaintiff, does not qualify as a disputed issue of material fact concerning the prima facie element of adequate job performance." *Id.* The Court went on to note that "[t]he plaintiff does not attempt to controvert the substance of the six other disciplinary notices she received ... rather, she altogether fails to address the bulk of the [defendant's] evidence." *Id.* Similarly, BSC's denial of Amtrak's claim that the floor was not cleaned properly is immaterial in light of its failure to respond to other deficiencies in its performance, each which independently permitted Amtrak to terminate the contract. As such, the Court does not need to concern itself with the issue of whether the Station's floor was cleaned daily to find that Amtrak was legally permitted to terminate the contract based upon the other conceded defaults.

▮ Finally, despite BSC's contention that Amtrak failed to provide notice of their dissatisfaction prior to the termi-

nation of the contract, the Court notes that such notice was not required by the contract. Indeed, pursuant to paragraph 8 of Form 69, Amtrak had the *option* of allowing BSC a "cure period" to remedy any performance problems.[10] Thus, it is not necessary for the Court to determine whether BSC was made aware of any problems with its performance prior to the termination of the contract.[11]

**(2) Amtrak Did Not Breach the Contract When It Denied BSC's Request For Additional Payment of $6,000.**

▮ A contractual provision for possible compensation does not render its denial an automatic breach. *See UNUM Life Ins. Co. of America v. Ward,* 526 U.S. 358, 369, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) ("failure to comply with conditions precedent ... prevents an action by the defaulting party to enforce the contract") (internal quotation marks and citation omitted). BSC contends that it is entitled to an additional $6,000 because it performed requested and authorized services that were not within the scope of the written contract. BSC's Stat. of Disp. Facts ¶¶ 4–5; Nyanfore Aff. ¶¶ 9, 17. BSC asserts that the additional work requested included "constant and continuous mopping and cleaning of the floor due to a leaking roof [and] frequent cleaning of the lobby due to construction .taking place outside...." BSC's Stat. of Disp. Facts ¶ 5.

However, as noted above, mere allegations by a party are insufficient to defeat a summary judgment motion. Rather, BSC must "support [its] allegations ... with facts in the record; mere unsubstantiated

---

10. Paragraph 8 of Form 69 provides in pertinent part: "At its sole option, Amtrak may require a cure period of the failure involved rather than terminating the Order in whole or in part." Amtrak's Stat. of Facts ¶ 5; Amtrak's Mot., Ex. 1.

11. The Court notes, however, that it appears BSC was in fact aware of problems with its performance as BSC's November 18, 1999 letter mentions Amtrak's dissatisfaction with its cleaning services. BSC's Opp'n., Ex. D.

allegation[s] ... create[ ] no 'genuine issue of fact' and will not withstand summary judgment." *Harding,* 9 F.3d at 154 (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548). BSC has not met its burden here, having failed to provide *any* documentation showing that Weidel or Wilson requested additional services from its employees or that any additional services provided were outside the scope set forth in Attachment A of the contract.[12] Moreover, Amtrak has provided a sworn affidavit and exhibits from Wilson in which she denies ever having requested or authorized BSC's employees to do any additional work. Amtrak's Mot., Wilson Aff. ¶¶ 14–15, Ex. D, E. With nothing more than BSC's unsubstantiated allegations to the contrary, this Court must accept as true the facts as substantiated by Amtrak. As such, the Court finds that BSC cannot establish its claim that Amtrak breached the contract by failing to honor BSC's submission for the additional payments.

**(B)** *BSC's Promissory Estoppel Claim*

▉ In addition to its claim for breach of contract, BSC seeks recovery under the doctrine of promissory estoppel. Pursuant District of Columbia law,[13] "[t]o establish a promissory estoppel claim, the plaintiff[ ] must show (1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to his or her detriment." *In re U.S. Office Products Co. Securities Litigation,* 251 F.Supp.2d 77, 97 (D.D.C. 2003) (citations omitted) (applying District of Columbia law); *see also Granfield v. Catholic University of America,* 530 F.2d

1035, 1042 (D.C.Cir.1976) (citing *Restatement of Contracts, § 90,* which provides that "a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."); *Willoughby v. Potomac Elec. Power Co.,* No. 94–1313, 1995 WL 761308, at *4, 1995 U.S. Dist. LEXIS 19208, at *12 (D.D.C. Dec. 14, 1995). And, "[p]romissory estoppel is recognized in the law of the District of Columbia as a theory allowing recovery in contract *when there may have been a failure of proof of certain elements necessary to the formation of an express contract* ... if a refusal to enforce a promise admittedly made would in the circumstances (usually reliance) result in injustice." *Federal Ins. Co. v. Thomas W. Perry, Inc.,* 634 F.Supp. 349, 352–53 (D.D.C. 1986) (emphasis added). Therefore, District of Columbia law presupposes that an express, enforceable contract is absent when the doctrine of promissory estoppel is applied. *See Int'l Bus. Mach. Corp. v. Medlantic Healthcare Group,* 708 F.Supp. 417, 424 (D.D.C.1989) (noting that "courts have held that an integrated written contract controls as against any and all prior inconsistent oral agreements or promises; such a contract nullifies the effect that promissory estoppel might otherwise have.") (citing *Durkee v. Goodyear Tire & Rubber Co.,* 676 F.Supp. 189, 192 (W.D.Wis.1987) ("The doctrine of promissory estoppel was adopted because the

---

**12.** Amtrak has provided a copy of the invoice submitted by BSC for "[j]anitorial cleaning. (Extra work done during the contract year as justified 5/26/00)." Amtrak's Mot., Wilson Aff. Ex. D. There is no further explanation given regarding the nature of the services provided, nor is there an indication of how

many hours BSC employees allegedly expended performing the services.

**13.** As mentioned above, paragraph 19 of Form 69 provides that the law of the District of Columbia governs the Purchase Order. Amtrak's Mot., Ex. 1.

requisites of a contract between the parties did not exist. After all, there would be no need for the doctrine if an action for breach or specific performance of a contract could be brought. The rationale for the doctrine simply disappears when the parties finally enter into a contract.")). This principle is consistent with the positions set forth in treatises recognized by the District of Columbia and precedent of other jurisdictions, which have also concluded that a party cannot assert a claim for promissory estoppel where there is an enforceable contract. *See, e.g., Terry Barr Sales Agency, Inc. v. All–Lock Co., Inc.,* 96 F.3d 174, 181 (6th Cir.1996) (holding that "where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel ...."); *Walker v. KFC Corp.,* 728 F.2d 1215, 1218 (9th Cir. 1984) (finding that promissory estoppel has been deemed "inapplicable at law" where the promises alleged by the plaintiff were "bargained for and supported by consideration"); *Constar, Inc. v. Nat'l Distribution Ctrs., Inc.,* 101 F.Supp.2d 319, 323 (E.D.Pa.2000) ("[p]romissory estoppel is applied to enforce a contract which is not supported by consideration, in other words, where there is no binding contract"); 8 Arthur L. Corbin, Corbin on Contracts § 8.11 (1962) (" 'Promissory estoppel is not a doctrine to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to provide a breach of contract.' In effect, those decisions hold that promissory estoppel cannot apply when there is a valid, written contract."); 2 Ronald A. Anderson

on the Uniform Commercial Code § 2–204:24 (3d ed. 1997) ("When consideration under traditional standards is present, it is unnecessary to apply the concept of promissory estoppel. The theory of promissory estoppel becomes inapplicable when a legally sufficient contract exists. Thus, promissory estoppel will not be applied when there is a binding contract which determines the rights of the parties.").

■ BSC claims that Amtrak promised to pay it up to the maximum of $6,000 for the performance of additional work at the Station. Even assuming that Amtrak requested the performance of this additional work and that BSC is entitled to the full sum claimed, compensation for additional work is *expressly* provided for in the contract. Thus, in evaluating BSC's promissory estoppel claim, it is unnecessary for the Court to resolve the dispute between the parties concerning BSC's entitlement to this monetary benefit because the parties here had a written contract, undisputedly bargained for and supported by consideration, which covered the performance of additional services by BSC not specifically designated in the Purchase Order.[14]

In addition, BSC alleges that Amtrak promised that the contract would run for a period of two years, again relying upon an explicit provision in the Purchase Order. While the contract was scheduled to have a life of two years at its inception, the terms and conditions of the contract specifically authorized Amtrak to terminate the Purchase Order prior to the expiration of the contract period if BSC committed a de-

---

**14.** Even if the Court had to analyze the validity of BSC's promissory estoppel claim, it would not grant BSC relief under this doctrine. This is because BSC cannot prove that injustice would result from the failure to enforce the promise on which it relied. Moreover, the Court notes that injustice would only result if relief were granted under the doctrine of promissory estoppel because Amtrak relied upon the existence of the express written contract when it denied BSC's request for additional compensation. Granting relief to BSC would do the injustice of providing relief where its breach of contract claim has been rejected.

fault. Amtrak's Mot. Ex. 1 (Purchase Order at 1; Form 69, Paragraph 8).[15] Thus, BSC cannot establish that an irrevocable promise was made regarding the duration of the parties' contract in the face of what is expressly provided for in the contract.

This case is factually similar to the situation confronted by the California Supreme Court in *Youngman v. Nevada Irrigation District*, 70 Cal.2d 240, 74 Cal.Rptr. 398, 449 P.2d 462 (1969). In that case, the plaintiff accused the defendant, his employer, of failing to keep his promise to award him a merit pay increase and asserted a claim of promissory estoppel against his employer. In rejecting this claim, the *Youngman* Court concluded:

> [i]t seems clear that under these allegations that the [defendant]'s promise, ... that [the plaintiff] would be afforded a raise in April of each year, was part of the bargain under which [the plaintiff] entered the [the defendant]'s employ. By remaining in his position and presumably rendering satisfactory service he performed his part of the bargain and rendered the consideration called for by the employment contract. There is no occasion, therefore, to rely upon the doctrine of promissory estoppel, which is necessary only to supply consideration for a promise when no actual consideration was given by the promisee.

*Id.* at 468–69. Similarly, had BSC fulfilled its contractual obligations, it would have been protected from wrongful termination of the contract pursuant to District of Columbia contract law; reliance on promissory estoppel would therefore be unnecessary. "Promissory estoppel is not a doctrine designed to give a party ... a second bite at the apple in the event it fails to prove a breach of contract." *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869–70 (7th Cir.1999) (citing *Walker*, 728 F.2d at 1220). Thus, with the existence of "an express contract, [that is complete in its formation], governing the relationship out of which the promise emerged, there is no gap in the remedial system for promissory estoppel to fill." *Id.* at 869. As BSC cannot establish the existence of a promise made to it by Amtrak independently of those contained in the contract, *see Int'l Bus. Mach. Corp.*, 708 F.Supp. at 424, summary judgment on the claim of promissory estoppel must be granted in favor of Amtrak.

### (C) *BSC's Claim For Fraud*

■ In order to succeed on its claim of fraud, BSC must establish: "1) a false representation [by Amtrak]; 2) concerning a material fact; 3) made with knowledge of its falsity; 4) with intent to deceive; and 5) resulting in detrimental reliance by the plaintiff." *Sabin v. Regardie, Regardie & Bartow*, 770 F.Supp. 5, 8 (D.D.C.1991) (citing *Barlow v. McLeod*, 666 F.Supp. 222, 228 (D.D.C.1986)); *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C.1977). Because BSC cannot establish any of the required elements of fraud, this Court must grant summary

**15.** Paragraph 8 of Form 69 provides in pertinent part:

> Amtrak may, ... by written notice of default to [BSC], terminate the whole or any part of this Order in any one of the following circumstances: if [BSC] (1) fails to make delivery of the Supplies within the time specified herein as "delivery date" or any extension thereof; or (2) fails to perform any of the other provisions of this Order, or (3) so fails to make progress as to endanger performance of this Order in accordance with its terms. At its sole option, Amtrak may require a cure of the failure involved rather than terminating the Order in whole or in part. If [BSC] does not cure the failure within the period specified by Amtrak, then Amtrak shall have the right at that time to terminate the whole or any part of the Order.

Amtrak's Mot., Ex. 1.

judgment to Amtrak on BSC's fraud claim.[16]

■ BSC alleges that Amtrak fraudulently "praised the cleaning work [its employees] were performing...." BSC's Stat. of Disp. Facts ¶ 7. Specifically, BSC contends that Amtrak fraudulently misrepresented that BSC's performance was "fine" and that its alleged reliance on those representations caused it to incur additional costs and forgo other business opportunities. BSC Opp'n., Ex. F. As proof that Amtrak's alleged "praise" constituted a false statement, BSC alleges that after Amtrak terminated the Purchase Order, it retained a majority or all of BSC's employees at the Station to provide cleaning services. Amended Complaint ("Am.Compl.") ¶¶ 16–17, 20. However, BSC has not submitted *any* documentation or other evidence confirming the alleged retention of its employees by Amtrak, nor has it produced the alleged praiseworthy comments it received from Amtrak.[17] Moreover, not only does BSC concede in its "Answers to Interrogatories" that Amtrak did not make any false, fraudulent or misleading oral statements, Amtrak Mot. p. 16, Ex. 3 (BSC Answers to Defendant's Interrogatories No. 9), but BSC fails to rebut the challenge to the quality of its performance in light of the documentation submitted by Amtrak. In addition, BSC admitted in its "Answers to Interrogatories" to writing and signing at least nine other business contracts during the time period of June 2000 to May 2001, negating the assertion that they "refrain[ed] from bidding on *any* contracts" during that time. BSC's Opp'n. at 7; Amtrak's Mot. Ex. 3 (BSC's Answers

to Defendant's Interrogatories No. 4); Reply of National Railroad Passenger Corporation in Support of Its Motion for Summary Judgment ("Amtrak's Reply") pp. 4–5. Because "allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient," *Bennett,* 377 A.2d at 60, the Court must grant summary judgment in favor of Amtrak on the fraud claim, as the sole basis for BSC's position is based on mere conclusory allegations.

Furthermore, the evidence produced by Amtrak overwhelmingly disproves BSC's fraud allegations. Wilson Aff. ¶¶ 4–5, Ex. A. Not only does Amtrak provide Wilson's detailed observations of BSC's performance, but it also provides the admission by BSC that it could not identify any fraudulent statements made by Amtrak. *See* Amtrak's Mot. p. 17 and Ex. 3 (BSC's Answers to Defendant's Interrogatories No. 9—"BSC cannot ... describe an oral statement [that was false, fraudulent, or misleading in nature]").

■ BSC also maintains that Amtrak fraudulently represented its reasons for terminating the Purchase Order, allegedly using BSC's default as a pretext for contracting with another cleaning service at a lower price. BSC's Stat. of Disp. Facts ¶¶ 14–15; Nyanfore Aff. at ¶ 30. The Court also finds this position unconvincing, as not only does a preponderance of the evidence show that Amtrak legitimately found BSC in default, but "it is undisputed that Amtrak incurred an additional expense of almost $30,000 in order to replace BSC's services for the period of August 2000 to June 2001." Amtrak's Mot. at 17,

---

16. The Court finds it unnecessary to examine whether BSC suffered injury as a result of allegedly relying upon Amtrak's representations because of BSC's failure to establish (1) that Amtrak made the purported fraudulent statements, (2) that even if made they were

fraudulent, and (3) that they were made with an intent to deceive BSC as to a material fact.

17. Again, BSC appears to indicate that this support lies in its Exhibit B, which it never presented to the Court.

and Wise Aff. ¶ 7. Although BSC did request an increase in its monthly payments both prior to and after the RFQ was issued, Amtrak had no obligation to grant the increase before or during the rebidding process. *See Malone v. Saxony Coop. Apartments, Inc.,* 763 A.2d 725, 729 (D.C.2000) ("[t]he failure to agree on or even discuss an essential term of the contract may indicate that the mutual assent required to make or modify a contract is lacking") (internal quotation marks and citation omitted). Rather, Amtrak could have chosen to simply deny BSC's May 25, 2000 request for an increase in compensation and continue paying BSC pursuant to the Purchase Order agreement. *See Murray v. Himelfarb,* 154 A.2d 358, 360 (D.C. 1959) (finding that "[i]f the sellers were required to pay for these [additional] improvements the effect would be to give to the purchaser something more than he contracted for, that is, he would receive the property in its improved condition rather than in the condition contracted for"). However, due to Amtrak's dissatisfaction with BSC's performance, Amtrak opted to terminate the agreement and replace BSC with Young to secure better quality cleaning services. On the record before the Court, proof of pretext has not been demonstrated by BSC.

In sum, with the facts as presented to the Court, "[f]raud could only be discerned, if at all, by means of impermissible speculation." *Bennett,* 377 A.2d at 60. As such, the Court cannot permit BSC's fraud claim to survive Amtrak's summary judgment motion.

### (D) *Amtrak's Counterclaim*

■ Amtrak has filed a counterclaim to recover the excess expenses it incurred after the termination of its Purchase Order with BSC. Having already concluded that BSC's default was sufficient reason for Amtrak to terminate the Purchase Order, the sole question remaining for the Court to answer is whether Amtrak is entitled to recover the excess costs incurred as a direct result of BSC's breach. The language of paragraph 8(B) of Form 69 expressly supports Amtrak's counterclaim.

Paragraph 8(B) provides that "[i]n the event Amtrak terminates this Order [based on BSC's default], Amtrak may procure ... Supplies similar to those so terminated and [BSC] shall be liable to Amtrak for any excess costs for such similar Supplies." Amtrak's Stat. of Facts ¶ 5; Amtrak's Mot., Ex. 1. This clause is consistent with District of Columbia law, which provides that "a court must apply ... 'the amount [of damages] necessary to place the non-breaching party in the same position he or she would have been in had the contract been performed.'" *Mashack v. Superior Mgmt. Servs., Inc.,* 806 A.2d 1239, 1241 (D.C.2002) (citing *Rowan Heating–Air Conditioning–Sheet Metal v. Williams,* 580 A.2d 583, 585 (D.C.1990)). And, the *Mashack* Court held that "[w]here a party fails to complete a service which it agreed to perform under a contract, the non-breaching party is entitled to receive the amount it costs to complete the service, to the extent that the amount exceeds the original contract price." *Id.* at 1242 n. 8 (internal quotation marks and citation omitted). BSC does not dispute that Amtrak's contract with Young contained the same scope of work as the Purchase Order issued to it by Amtrak. In addition, BSC does not provide any reason why the Court should not grant Amtrak's motion for summary judgment on the counterclaim, other than its belief that it did not default on the contract. Therefore, the Court must grant Amtrak's motion for summary judgment on its counterclaim and require BSC to reimburse Amtrak $29,315 for the additional expenses it incurred as a result of BSC's default.

## IV. *Conclusion*

For the aforementioned reasons, the Court will grant Amtrak's motion for summary judgment on all three claims asserted in BSC's amended complaint and also on its counterclaim for the excess costs it incurred because BSC failed to provide services as required by the Purchase Order.