James W. JOHNSTON, Appellant,

v.

Herbert HUNDLEY, Appellee.

Nos. 08–CV–1032, 08–CV–1149.

District of Columbia Court of Appeals.

Argued Dec. 11, 2009.

Decided Jan. 28, 2010.

---

James M. Loots, Washington, for appellant.

Kenneth H. Rosenau for appellee.

Before BLACKBURNE–RIGSBY and THOMPSON, Associate Judges, and FARRELL, Senior Judge.

Thompson, Associate Judge:

In this appeal, we are asked to determine whether the trial court erred in allocating sales proceeds and rental revenues and awarding damages in connection with the partition (by sale) of a residential property that had been jointly owned by appellant James Johnston and appellee Herbert Hundley. We affirm in part, reverse in part, and remand for the trial court to make further determinations consistent with this opinion.

## I. Background

Johnston and Hundley purchased a house at 1957 Biltmore Street, N W. ("the property"), as joint tenants in 2002, and they moved into the house in 2003 after renovating the property. They refinanced the house in December 2006, taking out a mortgage loan of $2,350,000 and drawing out cash equity of approximately $181,000, which they deposited into a joint bank account. After an altercation between the two men in February 2007, Johnston sought and obtained *ex parte* a civil protection order ("CPO") against Hundley from the Superior Court Domestic Violence Unit. The court ordered Hundley, who at the time was out of the jurisdiction on business, to vacate the property by March 5. On the same day the CPO was issued, Johnston liquidated the parties' joint bank account (which the court found held over $160,000 at the time).

On March 14, 2007, Hundley filed an action for partition of the property by sale. After granting Johnston's motion to consolidate the partition action with the domestic-violence case, the court (the Honorable Linda Turner) denied Hundley's request for the appointment of a trustee to sell the property. Instead, without a formal order of partition, the court permitted Johnston to remain the sole occupant of the house and to attempt to sell the property himself, upon his representation that he would assume Hundley's share of the monthly mortgage payments.[1]

By late 2007, the property still had not been sold. Hundley filed for summary judgment, requesting that the court order a partition by sale. The court granted the motion on December 13, 2007, and directed the parties to agree on a sale price, to sell the property "joint[ly] ... in a timely and expeditious manner," and to "comply with the reasonable requests of the real estate professionals through whom the property is being marketed." In the meantime, the court scheduled evidentiary hearings to determine whether Hundley was entitled to a portion of the rents from three portions of the property—an English base-

---

1. As the trial judge later acknowledged, the "normal route" in a partition case is to "appoint[ ] a trustee" to market and sell the property. We cannot help but observe that, had such a course been charted in this case, the parties likely would have avoided a significant amount of litigation and expense.

ment, a "junior suite," and a two-car garage—and, if so, whether there should be any offset by expenses associated with renting the spaces; whether Hundley was entitled to recover from Johnston half of the amount that Johnston withdrew from the joint account (or whether, instead, some portion of Johnston's share of the money could be retained by Johnston and applied toward the cost of improvements made to the property to ready it for sale); and what amount Hundley would be entitled to recover upon the eventual sale of the property. Those hearings took place on January 14, January 29, January 31, February 21, and March 19, 2008. The house sold for $2,550,000 on April 30, 2008, netting $40,727.02 in excess of the mortgage-loan balance, and realtor and settlement costs.

On August 4, 2008, the court issued an order in which it made several findings of fact, allocated the various monies, and assessed damages against Johnston for the delay in sale of the property. Specifically, in pertinent part, in addition to confirming an earlier order that divided the actual profit ($40,727.02) from the sale of the property evenly between the parties, the August 4, 2008 order directed Johnston to pay to Hundley $85,397.15, representing Hundley's share of funds from the joint account (one half of $161,102 plus interest); required Johnston to pay Hundley an additional $39,190, representing half of the net rental revenues from the property (including imputed rents from a portion of the property) during 2007 and 2008; resolved Johnston's claim for credits for the cost of improvements he made to the property;

and, because the court found that Johnston did not market the property with adequate diligence in a declining real-estate market, awarded Hundley $200,000, representing his share of the amount by which the market value of the property (and thus the parties' potential profit) had declined by the time of sale.[2]

## II. Discussion

Johnston takes issue with several aspects of the court's ruling. We address the claims in turn, in an order that obviates the need to discuss some of them. We proceed under the principle that when a case "was tried without a jury, the court may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001).

### A. Award of Damages Due to Delay

Johnston argues that the trial court had no authority to assess damages against him in the context of a partition action, and that, in any event, the court had no basis in the record to find either that he dragged his feet in selling the property or that the property's market value declined by over $400,000 from the time he undertook to sell the property himself (in March 2007), to the date when the property was actually sold (in April 2008).

 Hundley sought partition of the property pursuant to D.C.Code § 16–2901 (2001) (providing that "[t]he Superior Court ... may decree a partition of lands, tenements, or hereditaments on the com-

---

**2.** The court reasoned that the property had been worth $3 million at or around the time Johnston assumed control over the property's marketing. The court then subtracted from that amount the sale price of the house ($2,550,000) and $50,000, representing "increased real estate commissions, trustee fees and such" that the parties avoided, and divid-

ed the result in half, to arrive at the award to Hundley in the amount of $200,000. The court's rationale was that "[t]he differential between the fair market value of the house of $3 million and the final sale price of $2.55 million were [sic] the direct result of Mr. Johnston's delays."

plaint of a tenant in common ... or of a joint tenant"). D.C.Code § 16–2901(a). When a "property can not be divided without loss or injury to the parties interested, the court may decree a sale thereof and a division of the money arising from the sale among the parties, according to their respective rights." *Id.* As Johnston argues, by its terms section 16–2901 does not authorize the court to award damages (*i.e.,* monies in excess of the "money arising from the sale"). However, partition is "subject to equitable considerations," *Carter v. Carter,* 516 A.2d 917, 920 (D.C.1986) (quoting *Cobb v. Gilmer,* 365 F.2d 931, 933 (D.C.Cir.1966)) (internal punctuation and quotation marks omitted), and, as in any civil action, the trial court may exercise its inherent equitable powers. *See Hessey v. Burden,* 615 A.2d 562, 571 (D.C.1992) (noting that "[t]he judicial policy of preventing duplicitous litigation has been cited by this court as a reason for the exercise of general equitable jurisdiction"). At the same time, "invocation of the mantra of 'equitable considerations'" does not bestow complete license upon a trial court to "grant ... partition according to its views of the respective situations of the cotenants." *Carter,* 516 A.2d at 920.

▪ Johnston has not persuaded us that, in the circumstances presented, the trial court could not use its equitable powers to award damages to Hundley upon a finding, supported by competent evidence, that Johnston's conduct caused Hundley to realize lower sales proceeds than he would have realized upon a diligent sales effort by Johnston.[3] The trial court granted Johnston's request to retain sole posses-

sion of the house and to assume sole control over its marketing—*i.e.,* to sell the house "his way"—over Hundley's repeated objections. To allay Hundley's concerns that Johnston might not market the house expeditiously, the court warned that "if Mr. Johnston drags his feet, that's in the Court's view, a factor to be considered for the split." Johnston did not argue at the time that such a result would be *ultra vires;* and later, his counsel argued only that the court should hear expert testimony about fair market values and hold him accountable for failing to sell the property at a greater profit only if his actions exhibited bad faith. Therefore, even if we were to assume *arguendo* that the court exceeded its authority under the partition statute in making an assessment of damages, we could conclude that Johnston either invited the error when he insisted on selling the property on his own in the face of the court's admonitions, or waived any argument that the court had no authority to award damages for delay. As we shall explain, however, we need not resolve definitively the issue of the trial court's authority to award damages in a partition action because we conclude that, in this case, the evidence did not provide a sufficient basis for the damages award. Although the court made findings, supported by the record, attributing to Johnston delays in the sale of the property, the record does not provide substantiation of the court's finding regarding the property's baseline fair market value (*i.e.,* its value at, or within a reasonable period after April 6, 2007, when Johnston took on the responsibility to sell).

---

**3.** While there appears to be no partition case from this jurisdiction in which we approved a trial court's award of damages to a property owner in excess of the sale proceeds, we have recognized that, in certain circumstances, a trial court has the authority to award damages to a party as a result of an owner's delay in selling property. *See, e.g., Bacmo Assocs.*

*v. Strange,* 388 A.2d 487, 488, 489, 490 (D.C. 1978) (per curiam) (reversing judgment that precluded buyer, who sought and obtained specific performance of a contract for sale of residential property, from recovering money damages for increased renovation costs and loss of rental profits incident to the delay in transferring the property).

██ Turning to the underpinnings of the damages award, we are unable to conclude, as Johnston urges us, that the trial court clearly erred in finding that Johnston dragged his feet in selling the property.[4] The court found, *inter alia,* that Johnston and his housemate made it difficult to show the property because they were present in the house during the realtors' open houses, which the court observed was "contrary to usual custom." Further, the court found that a stop-work order issued by the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") was "prominently displayed in the front of the property during the open houses," supporting an inference that Johnston's "efforts to market the property were half-hearted at best, and were really a form of lip service at worst." Additionally, the court found that Johnston initially listed the house on the internet for $3.99 million—a price far in excess of the price at which it was eventually listed by realtors and the price at which it eventually sold—and presented "no affirmative evidence . . . of any further marketing" efforts. The court noted that the "house was officially off the market from January 15, 2008 through February 12, 2008[,]" because Johnston allowed the listing agreement to lapse. The court also suggested that Johnston's minimal sales efforts could be explained in part by the facts that Johnston "had far greater financial resources than" Hundley, so that "the burden of delay in the sale of this house did not fall equally upon the parties[;]" that Johnston was able to "reap[ ] many of the benefits stemming from his application for a temporary/civil protection order" because he lived in the house with "custom crafted 'improvements[;]' " and because

Johnston had "control over the rents" and the money that he liquidated from the joint account. There is evidence in the record to support most, if not all, of these findings. It is true, as Johnston argues, that the record also contains suggestions (if not evidence) that Johnston's marketing of the property was stymied somewhat by the need to complete improvements on the house, and acknowledgments by both sides that a period of months would have been required to sell the property even with the most diligent effort.[5] But we cannot say that the trial court erroneously exercised its discretion in finding that the delay was principally attributable to Johnston's less-than-diligent sales efforts. *See Bedell v. Inver Housing, Inc.,* 506 A.2d 202, 205 (D.C.1986) ("In reviewing findings of fact, the question before this court is not whether we would have made the findings the trial court did, but whether on the entire evidence we are left with the definite and firm conviction that a mistake has been committed.") (citation, internal quotation marks, and alterations omitted).

██ We agree with Johnston, however, that the record contains insufficient evidence to support the court's finding that the baseline fair market value of the property was $3 million, $450,000 more than the eventual sales price of the house. The court began to craft its formula for assessing damages at the March 19, 2008 hearing. Judge Turner focused on "the value from the . . . refinancing[,]" that took place in November or December 2006, and Hundley's assertion—one he had made previously, always without reference to any evidence of record—that the refinancing loan "would have been 80% percent" of the house's appraised value. When the court asserted that it "could use that fig-

---

4. We review the trial court's findings of fact for clear error. *Wilkins v. Ferguson,* 928 A.2d 655, 666 (D.C.2007) (citation omitted).

5. For example, Johnston's counsel alluded to advice from realtors that "an average time on the market . . . was six to nine months for a house of this value."

ure because it's based on reason," Johnston's counsel objected that the figure was "based on reason but not in evidence."[6] He also reminded the court that no appraisal had been introduced into evidence. As Johnston argues (and argued before the trial court), there was no testimony or other evidence confirming that the lender performed an appraisal or showing that the refinancing loan was based on 80% of appraised value;[7] there were only the statements of Hundley's counsel, which were not evidence.[8] *See In re Estate of Bonham,* 817 A.2d 192, 195 n. 5 (D.C.2003) (reiterating that "statements of counsel are not evidence," and reversing trial court's order against one party that was premised only on a factual assertion by counsel for a different party). No real estate expert testified, even though Johnston's counsel urged that the damages award the court was considering would require "expert testimony from the real estate market."[9]

Notwithstanding the lack of testimony or other evidence about the actual loan-to-value ratio used in the refinancing and the lack of expert or even lay testimony fixing the property's value at $3 million, the court found in its August 4, 2008 order that a $3 million baseline value for the property was "supported by the 80% of value loan for 2.35 million used in the December 2006 refinancing."[10] This finding, based as it was on the bald assertions by Hundley's counsel, was especially inappropriate in light of the earlier assertions by Hundley's counsel during the proceedings on May 14, 2007 (about as early, we surmise, as anyone could have expected the property to sell), that "[o]ur sources say [the property is] worth $2.5 to $2.8 [million] depending on the willingness of the buyer."

■ The other rationale that the court cited for its finding about the decline in

---

**6.** Thus, Hundley is incorrect in asserting that "Johnston did not challenge the fact that the amount of the refinancing of the property in December 2007 was equal to 80% of the total value of the property" at the March 19, 2008 hearing, and in arguing that Johnston conceded the point.

**7.** Johnston's counsel suggested to the court that the house was appraised, at the time of the refinancing, at "what appeared to be an excessive number."

**8.** At oral argument, this court repeatedly and pointedly asked Hundley's counsel whether there was any testimony or other evidence about the "80% figure." Hundley's counsel represented to the court that he had elicited such testimony from Johnston during cross-examination, and he offered a page citation to the record. However, neither that page nor any other page in the record contains such testimony.

**9.** Johnston's counsel reminded the court that it had "ordered an immediate sale as of the first date that the partition was filed," which

"would not have achieved [the property's] full market potential" because, as "any number of experts in the real estate industry could testify ... a court-ordered sale does not achieve the market value as a fully marketed property over time."

**10.** The court did so (1) even though it had observed that there was a "falling [real estate] market" and Hundley's counsel had averred that an appraisal in connection with the refinancing would not have been done in December 2006, but months earlier ("early in the refinance process which took a couple of months"); and (2) while acknowledging that the loan amount of $2,350,000 did not equal 80% of $3,000,000 (80% of $3,000,000 being only $2,937,500). The court reasoned, however, that $2,937,500 plus the increased value of the property from improvements to the library came reasonably close to $3,000,000. The library improvements were not complete, however, when Johnston first undertook to sell the property. The court stated that its estimate was "supported by both parties' testimony of the value before the issuance of the 80% loan/refinance," but we see no basis in the record for this statement.

market value of the property was a proffer by Johnston's counsel that Johnston "would have testified ... that he held an open house for realtors at which he requested the realtors to give them their best good faith estimate as to what a listing price should be and what a sale price would be and all of those were in the $3 million range—$3 plus million...."[11] However, neither Johnston nor anyone else testified about any such estimates, and the record reveals nothing about when the estimates were given or what assumptions (as to timing, improvements to the property, etc.) they reflected. Moreover, there appears to be no dispute that, working through realtors, the parties eventually listed the property at $2.9 million in September 2007, but were unable to procure a buyer at the realtors' recommended price.[12] A fortiori, the proffer as to hearsay declarations by nameless realtors who presumably were competing for Johnston's business in giving their estimates of an

appropriate listing price was not probative as to the fair market value of the property.

■ An appellate court should uphold a damages award "unless it lacks support from any competent credible evidence." *Mashack v. Superior Mgmt. Servs., Inc.*, 806 A.2d 1239, 1242 (D.C.2002); *see also Barnes v. Sherman*, 758 A.2d 936, 943 (D.C.2000) (reversing property distribution award where trial court made no finding that valuation reasonably reflected an accurate market value). Here, there was no "significant probative evidence" in the record and little more than speculation to support the trial court's finding that the baseline fair market value of the property was $3,000,000. *Lowrey v. Glassman*, 908 A.2d 30, 37 (D.C.2006) (citation and internal quotation marks omitted). We conclude that none of the bases on which the court relied to find the baseline fair market value of the property was sufficient to enable plaintiff Hundley to meet his burden[13] of establishing that the sales pro-

11. Although the court did not rely on the price at which Johnston listed the property on the internet, Hundley suggests that this evidence supports the damages award. He relies on case law suggesting that "[t]he owner of ... land ... is generally held to be qualified to express his opinion of its value merely by virtue of his ownership. He is deemed to have sufficient knowledge of the price paid ... and the possibilities of the land for use, to have a reasonably good idea of what it is worth." *District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land*, 534 F.2d 337, 339 n. 4 (D.C.Cir.1976) (citation omitted). However, while there was no error in permitting Johnston to testify that he initially thought the property could be sold for $3.99 million, "[w]here ... a special expertise is required to estimate the value ... [,] testimony respecting the owner's opinion, without more, does not provide an adequate basis for a reasonable estimate of value." *Mahallati v. Williams*, 479 A.2d 300, 307 (D.C.1984); *see also District of Columbia v. Burlington Apartment House Co.*, 375 A.2d 1052, 1055 n. 5 (D.C.1977) (en banc) (observing that "an unacted-upon offer to sell is not highly proba-

tive of value[,]" and that a "landowner's offering price is likely to be exaggerated, as a starting point for bargaining. That, however, goes to the evidence's weight, rather than its admissibility").

Hundley argues in the alternative that Johnston must be held to a $3.1 million baseline value of the property. However, the record shows that Hundley's counsel was the first to quote such a figure, telling the court at a hearing on March 14, 2007 that "[t]he two gentlemen share a $3.1 million house in the Kalorama area." At the next hearing, on April 6, 2007, Hundley's counsel stated that "Johnston ... is living in a $3,000,000 house." Shortly thereafter, Johnston exclaimed, "I have never put out the $3.1 million offer .... that is their figure, not mine."

12. The property sold only after the parties agreed to drop the offering price, initially to $2.65 million, in 2008.

13. *See Swartz v. Becker*, 246 N.J.Super. 406, 587 A.2d 1295, 1298 (1991) (per curiam) (providing that "[g]eneral rules governing burden

ceeds to be divided were anything other than the net profit (roughly $40,000) actually realized upon the sale and closing in April 2008, and that the trial court erred in awarding $200,000 to Hundley as his 50% share of the "lost" profit.[14]

## B. Rental Income

■ Johnston next argues that the trial court erred in awarding Hundley a share of the rental revenues that Johnston collected, or should have collected, in 2007 and 2008 before the house was sold.[15] We agree. To be sure, the partition statute provides that

> [i]n a case of partition, when a tenant in common has received the rents and profits of the property to his own use, he may be required to account to his cotenants for their respective shares of the rents and profits. Amounts found to be due on the accounting may be charged against the share of the party owing them in the property, or its proceeds in case of sale.

D.C.Code § 16–2901(c) (2001). However, the language of the statute is permissive,

not mandatory, and we conclude that it does not dictate what should occur in the situation presented here, *i.e.,* where the tenant in possession has assumed all responsibility for paying the mortgage on the property, relying in part on rents that the parties used to defray their mortgage expenses when they occupied the property together.

The trial court found, and the parties acknowledged at oral argument, that Johnston and Hundley rented out portions of the property "as landlords in order to have a reduction in the amount of their mortgage." It is undisputed that from March 2007, when Hundley vacated the property, through March 2008, Johnston alone was responsible for each month's mortgage payment, footing the bill for his share as well as Hundley's.[16] We see no reason why Hundley should have been entirely "relieve[d] ... from his contractual obligation to the mortgage company" as his counsel advocated, and "out from under the mortgage," as the trial court put it, yet receive a portion of the rents that the parties had used to subsidize both of their shares of the mortgage.[17] We conclude

of proof apply in partition actions") (citation omitted).

14. Neither party contends that Hundley was entitled to any share other than 50% of the actual or imputed net proceeds.

We note that the $200,000 damages award was greatly in excess of the amount Hundley sought as damages. Hundley testified on February 21, 2008 that he sought a payment of one-tenth of one percent of the (eventual) gross sales price for each month until the property was sold. That formula would have netted him a little over $7,500 (.001 times $2.55 million times three months until the April 2008 date of sale). The damages award also greatly exceeded the 3% of gross sales price penalty that Hundley's counsel suggested in open court on March 19, 2008.

15. The court found that from January 2007 through the end of April 2008, the rent for the garage was $8,800 ($550 × 16); the rent for the junior suite was $32,000 ($2,000 × 16);

and the "rent paid by the tenants of [the] English basement" was $39,990 ($2,350 × 9 + $2,500 × 7.5). The court added the rents (which it calculated as totaling "$76,380") and found that Hundley's share was half of the total ($38,190). The court then awarded prejudgment interest in the amount of $1,500 and reduced Hundley's share by $500, which the court determined was one half of the "reasonable and necessary costs for [Johnston] having been a landlord...." After totaling the amounts, the court ordered Johnston to pay Hundley $39,190, as his share of the rental income.

16. In March 2007, Hundley did pay $5,000 toward the mortgage as required by court order. However, in its August 4, 2008 ruling, the court ordered Johnston to repay that amount to Hundley.

17. The court found in its August 4, 2008 order that the monthly mortgage payment was $11,994, that rents totaled between $4,900

that it was error to award Hundley any of the rental proceeds from March 2007–March 2008, when Hundley did not help to satisfy the mortgage obligation. This conclusion obviates the need to consider whether the court erred in imputing rent collections from portions of the property as to which Johnston collected no actual rent during several of the months involved.

The trial court's award to Hundley included a share of the rental revenues for January and February 2007. The court found that Hundley paid his share of the house expenses for those months, but that "Johnston exclusively received all the rent and incomes from all tenants." However, there was no testimony that Hundley did not receive his share of the rental proceeds prior to his ouster in March 2007, and the record suggests that Hundley's share of the January and February 2007 rents may have been deposited into the parties' joint account [18] (and thus already was accounted for through the court's directive that Johnston pay to Hundley half the amount liquidated from the joint account). On remand, the court should reconsider its findings as to Hundley's entitlement to a share of the January and February rents. As to April 2008, when Johnston no longer took full responsibility for the mortgage payments and Hundley was required by the court to pay his half, we agree that Hundley is entitled to an offset for his share of April 2008 rental revenue. We leave it to the trial court on remand to determine the exact amount of the offset.

## C. Improvement Projects

 Lastly, we consider Johnston's argument that he should have received credits for expenditures he bore in completing three renovation projects at the property prior to its sale—a back stairway, certain landscaping of the back yard, and the study/library. The general rule is that "[t]he right to compensation for improvements made without the consent of co-tenants is not a legal right[.]" *Hartog v. Siegler*, 615 S.W.2d 632, 636 (Mo.Ct.App. 1981) (explaining, however, that even where a co-tenant did not consent, a court may require that such compensation be made "out of partition proceeds when said improvements are made in good faith, are of a necessary and substantial nature, materially enhance the value of the property, and the circumstances show that it would be equitable to do so") (citation omitted); *see also Shotwell v. Shotwell*, 202 Va. 613, 119 S.E.2d 251, 255 (1961); *In re Marriage of Marr*, 264 Ill.App.3d 932, 202 Ill. Dec. 657, 638 N.E.2d 303, 305 (1994).

The trial court declined to award Johnston credit for any of the projects. As to the back-stairway and landscaping projects, the court concluded that those "home improvements were made exclusively by [Johnston], without consultation with [Hundley] and, thus, will not be paid back to Mr. Johnston." As to the library, the court pointed out that, although Hundley had agreed to the renovation, Johnston testified that he paid for the projects with money from the joint account, and, therefore, Hundley had "paid the [cost] . . . of

---

and $5,050 per month, that Hundley's half of the mortgage payment was "5,997," and that the parties "each contributed equally to the purchase and mortgage expenses of the house." Even if half of the rental income as found by the court is credited against Hundley's (former) share of the mortgage, Johnston was left to pick up about $3,500 in mortgage expenses that had been Hundley's responsibil-

ity. In other words, it does not appear that Johnston reaped any profit from collecting and retaining the share of the rents formerly allocable to Hundley.

**18.** Johnston's counsel advised the court that when the parties lived in the property together, rental revenues went into the parties' bank account to pay the mortgage.

the library from already existing joint funds. In short, Mr. Hundley ha[d] already paid that money and any value of it was divided by the sale price of the house."

The court's finding that Hundley did not agree to the landscaping and back-stairway projects is not supported by the record. At the hearing on April 6, 2007, Hundley's counsel told the court that the monies in the parties' joint account "was intended for those three projects" "the library or English study, the back yard and the staircase." He added, "If, Mr. Johnston, is standing here today saying I need to do the study, I need to do the backyard, I need to do the stairs. Our answer is yes.... Do them out of the [joint account] per court order." Johnston informed the court at the very same hearing that the three projects "are all underway."

At the January 29, 2008 hearing, there was another discussion about the projects. Johnston's counsel stated that "I was not here ... when those hearings were taking place, but there seems to have been made on the record ... at least three major projects that everyone agreed had to be ... done in order for ... the property to be sold." He told the court that "Mr. Johnston spent the money in reliance upon both the Court's directive and the representation of Mr. Hundley ..." Expressing skepticism that such an agreement had occurred at a prior hearing, the court asked counsel to "[p]oint that out ... in the transcript." Both counsel referenced the April 6 hearing, but the court preempted any answer by moving on to a discussion of costs. Hundley's counsel subsequently said—entirely contrary to his earlier representations to the court—that

he "intend[ed] to put [Hundley] on the stand ... because, Your Honor, ... we didn't want those three projects done. The only one we wanted done was that there was an open contract for the study...."[19]

■ Because Hundley's counsel represented in open court, before the renovation projects were completed, that Hundley agreed to all three projects and that the costs of the projects should be paid from the joint account, the court should not have acceded to his later position that he agreed to only one of the projects. *See Porter Novelli, Inc. v. Bender*, 817 A.2d 185, 188 (D.C.2003) (declaring that a litigant may not play "fast and loose with a court of justice by changing his position according to the vicissitudes of self interest") (citations omitted). Thus, Johnston was entitled to a credit for the improvements if he provided sufficient evidence of their costs. However, we see in the record no evidence of the costs of the back-stairs project. Accordingly, we uphold the court's ruling denying Johnston any credit as to that project. To sustain his burden of proving the cost of the landscaping, Johnston submitted an email with an attachment that included the initial quotes for the work as well as a check evidencing the initial payment to the landscaper in the amount of $5,000.[20] On remand, the trial court should make a finding on the basis of this record evidence as to the cost incurred and proven for the landscaping project and afford Johnston a credit, for half that amount, against any sums he owes to Hundley.

There was no dispute that Hundley agreed to the renovation of the library.

---

**19.** Johnston's counsel got it just about right when he observed to the trial court that Hundley's counsel "continually pepper[ed] the record with ... entirely incorrect representations of what happened before."

**20.** Johnston testified that the back-yard landscaping was not completed because of the DCRA's stop-work order.

The trial court's rationale for not affording Johnson a credit for expenditures for the library renovation—that Hundley already had paid his share of the project, in that Johnston used joint funds to pay for the project—simply was incorrect, because the trial court ordered Johnston to pay back Hundley's share of the joint account in full, without any offset for Hundley's share of the library renovation costs.

The court admitted into evidence a contract from Van–Walker Woodworking for the library project, a contract that the parties entered into before Hundley vacated the property. Pursuant to that contract, the parties jointly paid $17,655.65 on January 15, 2007. The trial court found that the balance owed under the contract after that date was $31,000. Yet, the invoice sent by Van–Walker on December 31, 2007, shows a balance (for items excluding those the trial court determined were not a part of the agreement between the parties)[21] of $33,454.90, not $31,000. On remand, the court should explain the discrepancy or correct its finding as to the balance of the agreed-upon cost for the library project. In addition, the trial court should subtract the (correct) balance, plus the amount that the court finds should be credited to Johnston for the back-yard landscaping project, from the amount that the court found Johnston liquidated from the joint account ($161,102), and award each party half of the remaining amount. That is the formula Hundley agreed to when his counsel told the trial court that the improvement projects should be paid for out of the money withdrawn from the joint account.

---

21. The trial court also found that the agreement did not contemplate certain extraneous items that Johnston argued were a part of the library project, such as "electricians, marble, [j]acuzzis[.]" We cannot say that the trial

## III. Conclusion

For the foregoing reasons, we reverse those portions of the court's order (1) awarding Hundley $200,000 for lost profits, (2) awarding Hundley one-half of all the net rents from January 2007, through March 2008, (3) requiring Johnston to pay Hundley the amount of $85,397.15 as Hundley's share of the proceeds of the parties' joint bank account, and (4) denying Johnston any credit for renovation costs. We remand the case to the trial court to determine (1) the amount, if any, that Johnston owes to Hundley as Hundley's share of the April 2008 rental revenues, and (2) the amount of the credit to which Johnston is entitled for expenditures for the landscaping and library projects, and (3) once that credit is applied, the amount that Johnston owes Hundley for his share of the monies from the joint account. In all other respects, the judgment is affirmed.

*So ordered.*

---

court was "plainly wrong" in finding that such items were not a part of the agreement between Johnston and Hundley. D.C.Code § 17–305(a) (2001).